**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Donald G. BYRD, Defendant-Appellant.**

**No. 78–2459.**

United States Court of Appeals, Seventh Circuit.

Argued April 23, 1979.

Decided Oct. 15, 1979.

Rehearing Denied Dec. 19, 1979.

Richard C. Ver Wiebe, Fort Wayne, Ind., for defendant-appellant.

Robert L. Klarquist, Department of Justice, Land & Natural Resources Division, Washington, D.C., for plaintiff-appellee.

Before CUMMINGS, Circuit Judge, MOORE, Senior Circuit Judge,* and TONE, Circuit Judge.

MOORE, Senior Circuit Judge.

The defendant Donald Byrd appeals from an order granting the plaintiff's (United States) motion for summary judgment and from the judgment thereon, entered on August 11, 1978 in the United States District Court for the Northern District of Indiana, Honorable Robert A. Grant, *District Judge*, whereby Byrd and two other defendants, who have not appealed, were permanently enjoined "from placing any fill or other material of any kind into the waters or the adjacent or contiguous wetlands of Lake Wawasee, Indiana until such time as a valid Department of Army permit is issued in the discretion of the District Engineer, United States Army Engineer District, Detroit."

## I.

Defendant Byrd, a golf professional and a land developer, owns land in Kosciusko County, Indiana which includes a golf course bordering Lake Wawasee in Indiana. The lake is a 2,500 to 3,000 acre fresh water lake used by interstate travelers and seasonal residents for water-related recreational purposes. Prior to June 15, 1976, Byrd

* Honorable Leonard P. Moore, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

and other lakeshore owners engaged in fill projects in an effort to convert the wetlands (swamps) bordering Lake Wawasee into land suitable for residential development. The discharge of fill onto this land was performed without a state water quality certification or a permit from the Army Corps of Engineers (the "Corps").

The Federal Water Pollution Control Act ("FWPCA") makes the discharge into the waters of the United States of any "pollutant", including dredged spoil, rock, sand and cellar dirt, by any person, unlawful, unless permits or other approvals have been obtained. 33 U.S.C. §§ 1311(a), 1362(6) and (7) (1976). Under § 404 of the FWPCA Amendments of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. § 1344 (1976), the Secretary of the Army was authorized to act through the Chief of Engineers, who, in turn, was authorized to issue permits for the discharge of dredged or filled material into navigable waters under certain conditions and procedures. The Corps planned to assert its new authority in stages.[1] In Phase I, which became effective with the issuance of the regulations, the Corps assumed permit authority over all navigable waters traditionally within the Corps' jurisdiction. In Phase II, to be effective on July 1, 1976, the Corps extended its control to other navigable waters newly defined to include intrastate lakes that are utilized by interstate travelers for water-related recreational purposes and freshwater wetlands that are contiguous or adjacent to other navigable waters (including such intrastate lakes) and support freshwater vegetation.[2]

In the regulations which set forth the phase schedule, the Corps included an exception in the time schedule. The regula-

1. Interim final regulations and the phase-in schedule were published on July 25, 1975, 40 Fed.Reg. 31322, as amended later in 41 Fed. Reg. 55524, Dec. 21, 1976. The phase-in schedule was codified at 33 C.F.R. § 209.120(e)(2)(i) (1977) which reads:

(2) *Discharges of dredged material or of fill material into navigable waters.* (i) Except as provided in paragraphs (e)(2)(ii) and (iii) of this section, Department of the Army permits will be required for the discharge of dredged material or of fill material into navigable waters in accordance with the following phased schedule:

(a) *Phase I.* After the effective date of this regulation, discharges of dredged material or of fill material into coastal waters and coastal wetlands contiguous or adjacent thereto or into inland navigable waters of the United States and freshwater wetlands contiguous or adjacent thereto are subject to the procedures of this regulation.

(b) *Phase II.* After July 1, 1976, discharges of dredged material or of fill material into primary tributaries, freshwater wetlands contiguous or adjacent to primary tributaries, and lakes are subject to the procedures of this regulation.

(c) *Phase III.* After July 1, 1977, discharges of dredged material or of fill material into any navigable water are subject to the procedures of this regulation.

2. The relevant portions of the definition of "navigable waters" include:

(g) Intrastate lakes, rivers and streams landward to their ordinary high water mark and up to their headwaters that are utilized:

(1) By interstate travelers for water-related recreational purposes;

(2) For the removal of fish that are sold in interstate commerce;

(3) For industrial purposes by industries in interstate commerce; or

(4) In the production of agricultural commodities sold or transported in interstate commerce;

(h) Freshwater wetlands including marshes, shallows, swamps and, similar areas that are contiguous or adjacent to other navigable waters and that support freshwater vegetation. "Freshwater wetlands" means those areas that are periodically inundated and that are normally characterized by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction; and

\* \* \* \* \* \*

(c) *"Lakes"* means natural bodies of water greater than five acres in surface area and all bodies of standing water created by the impounding of navigable waters identified in paragraphs (a)–(h), of this section. Stock watering ponds and settling basins that are not created by such impoundments are not included;

33 C.F.R. § 209.120(d)(2)(i)(g) and (h), (ii)(c) (1977).

However, on July 19, 1977, 42 Fed.Reg. 37122–37142, the Corps substituted revised final regulations for the interim final regulations which had been in effect. *See* 33 C.F.R. § 320.00 *et seq.* (1978). The new regulations used the term "waters of the United States" in place of "navigable waters" and gave it a new definition; the definition of "wetlands" also was altered. The relevant new definitions read:

[33 C.F.R.] § **323.2 Definitions.**

tion stated that the permit procedure would apply even before a navigable body of water came under the phase program if the

District Engineer determined that water quality concerns indicated the need for such action.[3]  Because Byrd and the other land-

---

For the purpose of this regulation, the following terms are defined:

(a) The term "waters of the United States" means:

(1) The territorial seas with respect to the discharge of fill material. (The transportation of dredged material by vessel for the purpose of dumping in the oceans, including the territorial seas, at an ocean dump site approved under 40 CFR 228 is regulated by Section 103 of the Marine Protection, Research and Sanctuaries Act of 1972, as amended (33 U.S.C. 1413).   See 33 CFR 324. Discharges of dredged or fill material into the territorial seas are regulated by Section 404.):

(2) Coastal and inland waters, lakes, rivers, and streams that are navigable waters of the United States, including adjacent wetlands;

(3) Tributaries to navigable waters of the United States, including adjacent wetlands (manmade nontidal drainage and irrigation ditches excavated on dry land are not considered waters of the United States under this definition).

(4) Interstate waters and their tributaries, including adjacent wetlands; and

(5) All other waters of the United States not identified in paragraphs (1)–(4) above, such as isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce.

\*    \*    \*    \*    \*    \*

(c) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.  Wetlands generally include swamps, marshes, bogs and similar areas.

(d) The term "adjacent" means bordering, contiguous, or neighboring.  Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent wetlands."

(e) The term "natural lake" means a standing body of open water that occurs in a natural depression fed by one or more streams and from which a stream may flow, that occurs due to the widening or natural blockage of a river or stream, or that occurs in an isolated natural depression that is not a part of a surface river or stream.

33 C.F.R. § 323.2(a) and (c) (1978).

The new rules do not change our conclusions. Byrd's wetlands fall within the new regulations, as noted below in footnote 7.  Most importantly, the new regulations continue the authority of the District Engineer to require individual dredging and filling permits when water quality considerations call for such action (*see* footnote 3 *supra* ).  The District Engineer has already made such a finding in this case in order to accelerate Corps jurisdiction over the wetlands of Lake Wawasee.

**3.**  33 C.F.R. § 209.120(e)(2)(ii) (1977) reads:

(ii) All other discharges of dredged or fill material that occur before the dates specified in paragraphs (e)(2)(i)(*b* ) and (*c* ) of this paragraph, [footnote 1, *supra* ] are hereby permitted for purposes of Section 404 of the Federal Water Pollution Control Act without further processing under this regulation; *Provided, however,* That the procedures of this regulation including those pertaining to individual and general permits (see paragraph (i)(2)(ix), of this section) shall apply to any discharge(s) of dredged or fill material if the District Engineer determines that the water quality concerns as expressed in the guidelines (see 40 CFR Part 230) indicate the need for such action.  .   .   .

Comparable discretionary authority is granted to the District Engineer under the new regulation:

**§ 323.4–4  Discretionary authority to require individual or general permits.**

Notwithstanding the provisions of §§ 323.-4–1 [allowing discharges of fill prior to a new time limit], 323.4–2, and 323.4–3, above, the procedures of this regulation and 33 CFR Part 325, including those pertaining to individual and general permits, shall apply to any discharge(s) of dredged or fill material if the District Engineer determines that the concerns of the aquatic environment, as expressed in the guidelines (see 40 CFR Part 230) indicate the need for such action because of individual and/or cumulative adverse impacts to the affected waters.  In such cases, he shall take such steps as are necessary to notify persons who would be affected by such action.  If the Regional Administrator, EPA, advises the District Engineer that the concerns for the aquatic environment as expressed in the Section 404(b) Guidelines require assertion of jurisdiction under § 323.4–4, and the District Engineer and Division Engineer disagree, the Office of the Chief of Engineers (DAEN–CWO–N and DAEN–CCH) shall be notified for further co-

owners had begun to accelerate their fill projects around Lake Wawasee, the Corps District Engineer held that the cumulative impact of all this activity would threaten the wildlife balance and water quality in the area. Therefore, he accelerated the Corps' jurisdiction over Lake Wawasee and its wetlands. On June 15, 1976, Byrd was advised that no further work could be done on the land fill projects until he obtained a permit from the Corps. On June 24, the Corps officials warned Byrd again and said that if the work continued, they would seek a court order. Byrd, believing that the Corps had no jurisdiction until July 1, again began filling in the land at a faster pace. This action was filed on June 28, 1976, along with a motion for a preliminary injunction. The court granted an *ex parte* motion for a temporary restraining order.

At a hearing concerning the preliminary injunction motion on July 6, 1976, the court heard extensive testimony. The hearing lasted a second day and sometime later the court with counsel went to view the Byrd property for itself. In the trial court's view the legal issues were whether Byrd's property was "wetlands" within the meaning of the regulations and whether the Corps had jurisdiction to regulate activity on Lake Wawasee and its wetlands.

The defendants conceded that Lake Wawasee is an intrastate lake over which the Corps could assert jurisdiction. They disputed, however, the claim that the land being filled was "wetlands" within the meaning of the regulation, 33 C.F.R. § 209.-120(d)(2)(i)(*h*). That regulation defined freshwater wetlands as "areas that are periodically inundated and that are normally characterized by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction. . . ." Apparently no one disputes the fact that some areas of Byrd's land are characterized by the prevalence of vegetation, such as cattails, which requires saturated soil condi-

tions. Byrd claimed that the regulation required proof that the wetlands were inundated by waters *from the lake*. According to Byrd, his land was higher than the water level and there was a natural barrier that prevented his land from ever being inundated by water from the lake.[4]

On the basis of the extensive testimony of experts and its own view of the property, the district court resolved this issue against Byrd. The court said that the evidence failed to show that a natural barrier existed. The court further held that the regulation does not require that the land be inundated by water from the lake; water from several sources could be the cause of the inundation. Thus the Byrd property contained contiguous or adjacent wetlands which came within the Corps' regulations. The court also held that the Corps had properly accelerated its jurisdiction to deal with the problem posed by landfill on the shores of Lake Wawasee and that the permit requirement did not constitute an uncompensated "taking" of property in violation of the Fifth Amendment, contrary to what Byrd had argued.

These findings were made in a comprehensive memorandum opinion dated August 13, 1976, wherein the district court granted the motion for a preliminary injunction, an order thereon being entered on November 9, 1976.

On September 23, 1977 the Government filed its motion for summary judgment, asserting that there was no genuine issue as to any material fact and that it was entitled to judgment as a matter of law. The court granted the motion from which plaintiff appeals.

## II.

Byrd argues that summary judgment was inappropriate in this case because there was a factual issue with respect to "the extent

---

ordination and resolution with the Administrator.
33 C.F.R. § 323.4–4 (1978).

4. We note that under the new regulations, the existence of a natural barrier is expressly insufficient to prevent the wetlands from being considered adjacent to the lake and thus a part of the waters of the United States.

of the scope of the original injunctive relief granted by this court's order as to defendant's land. . . ." Defendant's Response to Motion for Summary Judgment, App. 39. Essentially, he claims that the court was required to hold a trial to determine the exact location of the regulated wetlands on Byrd's property. In the same vein, he argues that the permanent injunction did not meet the standards of specificity of Fed.R.Civ.P. 65(d). His theory is that the injunction order should refer to an exact metes and bounds description of the wetlands on his property. He alleges that it was uncertain which lands the court considered to be "wetlands".

■ Rule 56, Fed.R.Civ.P. states that the response to a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial". Byrd failed to specify any precise finding of fact made with regard to the preliminary injunction which he still wished to contest. He presented only a generalized and vague claim that there were issues of fact for trial. Byrd put most of his emphasis on the legal arguments, not on issues of fact. Hence, the court properly disposed of this case on summary judgment.

■ Furthermore, the permanent injunction entered by the district court meets the requirements of Rule 65(d) because, in part, it was not designed to permanently bar Byrd from filling in his land, only to force him to obtain a permit. In the course of obtaining the permit he can extract from the Corps an exact statement of where the wetlands are and protect himself from further legal proceedings. Furthermore, Byrd cannot complain of the absence of a legal description of the wetlands since, as the district court noted, he has refused to permit his land to be surveyed. Finally, the wetlands are easy to separate from his other land because they are characterized by distinct vegetation. In short, Byrd must have a very clear idea of what he is enjoined from doing and to which part of his property the injunction applies.

## III.

Although he did not make this argument below, Byrd now argues that Congress and the Corps of Engineers lack the authority, under the Commerce Clause, Art. I, § 8, cl. 3, to regulate activities on and around Lake Wawasee, even if it is used by interstate travelers for recreational purposes. He asserts that he is challenging the extension of federal power to a non-commercial entity which is not included in the traditional definition of navigable waters which may be controlled by the federal government.

■ As defined in § 502(7) of the FWPCA Amendments of 1972, 33 U.S.C. § 1362(7) (1976): "The term 'navigable waters' means the waters of the United States, including the territorial seas". The legislative history of the Amendments establishes that Congress wanted to give the term "navigable waters" the "broadest possible constitutional interpretation". Conference Report, S.Rep.No.236, 92d Cong., 2d Sess. 144, *reprinted in* [1972] U.S.Code Cong. & Admin.News, p. 3822. *See also, Natural Resources Defense Council, Inc. v. Callaway*, 392 F.Supp. 685 (D.D.C.1975). The definitional language has been held to mean that "navigable waters" are all the waters within the geographic confines of the United States. *United States v. Ashland Oil & Transportation Co.*, 504 F.2d 1317 (6th Cir. 1974).

Given a Congressional intent to extend its water pollution regulations to all the "navigable waters" within its constitutional reach, the next step is to determine whether the particular regulations at issue fall within that reach.

■ The Constitution's grant of power to Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes", Art. I, § 8, cl. 3, has come to mean that Congress may regulate activities which *affect* interstate commerce. *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942). A statement by the Supreme Court in *Wickard v. Fillburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), possesses particular relevance for this case:

"[E]ven if appellee's activity be local and though it may be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect'." 317 U.S. at 125, 63 S.Ct. at 89.

Byrd's filling activities, although they are local, have the potential for exerting a substantial economic effect on interstate commerce by an easily traced chain of causation.

■ The recreational use of inland lakes has a significant impact on interstate commerce, as is testified to by the number of out-of-state visitors to Lake Wawasee in particular. The value of these lakes depends, in part, on the purity of their water for swimming, or the abundance of fish and other wildlife inhabiting them or the surrounding wetland and land areas. The Corps, among other authorities,[5] has come to recognize the importance of wetlands adjacent to lakes in preserving the biological, chemical, and physical integrity of the lakes they adjoin.[6] Destruction of all or most of the wetlands around Lake Wawasee, for example, could significantly impair the attraction the lake holds for interstate travelers by degrading the water quality of the lake, thereby indirectly affecting the flow of interstate commerce. We conclude that Congress constitutionally may extend its regulatory control of navigable waters under the Commerce Clause to wetlands which adjoin or are contiguous to intrastate lakes that are used by interstate travelers for water-related recreational purposes as defined by 33 C.F.R. § 209.120(d)(2)(i)($g$) and ($h$) (1977).[7] Furthermore, these regu-

---

5. One commentator has provided an excellent summary of the environmental importance of wetlands:

> Wetlands, whether they are coastal or inland, are aquatic zones between identifiable water bodies and dry land. The Fish and Wildlife Service of the United States Department of the Interior has identified twenty types of wetlands including fresh and salt water marshes, bogs, swamps, and low-lying flats and flood plains containing moist soil conditions and supporting aquatic vegetation. The value of these areas varies from place to place, but it is generally agreed that wetlands are a priceless, multi-use resource, and that in addition to their economic value, they perform many biological services including: (1) high yield food source for aquatic animals; (2) spawning and nursery areas for commercial and sport fish; (3) natural treatment of waterborne and airborne pollutants; (4) recharging ground water for water supplies; (5) natural protection from floods and storms; and (6) essential nesting and wintering areas for water fowl. However, because these areas interface with dry land, they also provide attractive sites on which to build and farm. The public interest in long term ecological and economic productivity often conflicts with short term economic gain; moreover, disregarding the long term effects may cause irreversible environmental destruction.

Caplin, *Is Congress Protecting Our Water? The Controversy over Section 404, Federal Water Pollution Control Act Amendments of 1972*, 31 U.Miami L.Rev. 445, 455–6 (1977). *See also United States v. Holland*, 373 F.Supp. 665, 675 (M.D.Fla.1974).

6. See the comments accompanying the new 1977 regulations:

> *Wetlands.* Prior to enactment of the FWPCA, the mean tide line (mean higher tide line on the West Coast) was used to delineate the shoreward extent of jurisdiction over the regulation of most activities in tidal waters under the 1899 Act as well as for mapping, delineation of property boundaries, and other related purposes. In freshwater lakes, rivers and streams that are navigable waters of the United States, the landward limit of jurisdiction has been traditionally established at the ordinary high water mark.
>
> The regulation of activities that cause water pollution cannot rely on these artificial lines, however, but must focus on all waters that together form the entire aquatic system. Water moves in hydrologic cycles, and the pollution of this part of the aquatic system, regardless of whether it is above or below an ordinary high water mark, or mean high tide line, will affect the water quality of the other waters within that aquatic system.
>
> For this reason, the landward limit of Federal jurisdiction under Section 404 must include any adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States, as these wetlands are part of this aquatic system.

42 Fed.Reg. 37128 (July 9, 1977).

7. We note that Lake Wawasee, by virtue of its size and the use of it made by persons from outside Indiana, would fit within the definition in the present regulations, 33 C.F.R. § 323.-2(a)(5) (1978), as an isolated lake and wetlands

 

latory definitions promulgated by the Corps are reasonably related to Congress' purpose: "The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters". 33 U.S.C. § 1251(a).

Other courts have reached the same conclusion. In *United States v. Holland*, 373 F.Supp. 665, 673 (M.D.Fla.1974), the court said: "It is beyond question that water pollution has a serious effect on interstate commerce and that the Congress has the power to regulate activities such as dredging and filling which cause such pollution". *See also, Leslie Salt Co. v. Froehlke*, 578 F.2d 742 (9th Cir. 1978); *Zabel v. Tabb*, 430 F.2d 199 (5th Cir. 1970), *cert. denied*, 401 U.S. 910 (1971), (upholding power of Corps to deny dredge and fill permit for environmental reasons under Rivers and Harbors Act of 1899 and Fish and Wildlife Coordination Act of 1934); *P. F. Z. Properties, Inc. v. Train*, 393 F.Supp. 1370 (M.D.Fla.1975).

### IV.

■ Byrd next argues that the requirement that he obtain a permit is tantamount to a taking of his property without compensation and, therefore, an illegal expropriation in violation of the Fifth Amendment. His argument assumes a "taking" which may never take place. If Byrd applies for a permit and the Corps then issues it, Byrd would have no further complaint. If the Corps denies his permit application, the reasons therefor must be disclosed, and Byrd may seek judicial relief, if warranted.

In essence, Byrd must exhaust his administrative remedies before he can raise this particular objection. It is not too much for the Government to ask that a determination of Byrd's privilege to fill what may be ecologically-vital wetlands be made, initially at least, by a governmental agency, in this case the Corps. It is perfectly reasonable for Congress to provide a mechanism for balancing and controlling the development of a lake so that its value is not destroyed by overdevelopment. Byrd should save his

complaint until he complies with the Corps' permit procedure.

The judgment of the district court is affirmed.

the degradation or destruction of which could affect interstate commerce. These new regula-

tions make up in flexibility and breadth what they lack in definiteness.