**LEAGUE TO SAVE LAKE TAHOE, a non-profit corporation, and James L. Porter, Jr., Plaintiffs,**

v.

**CRYSTAL ENTERPRISES, a partnership, and County of Washoe, a Political Subdivision of the State of Nevada, Defendants.**

**Civ. No. R–75–87 BRT.**

United States District Court, D. Nevada.

June 6, 1980.

Oliver C. Custer, Reno, Nev., Laurens H. Silver, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., Harold A. Berliner, Berliner & Ellers, Nevada City, Cal., for plaintiffs.

Calvin R. X. Dunlap, Dist. Atty. of Washoe County, A. Stanyan Peck, Deputy Dist. Atty., Reno, Nev., for Washoe County.

Hill, Cassas, deLipkau & Erwin, Frank Cassas and Keith S. Ching, Reno, Nev., for Crystal Enterprises.

## OPINION

BRUCE R. THOMPSON, District Judge.

This lawsuit involves the construction of a parking garage/hotel tower at the Crystal Bay Club at Lake Tahoe. The plaintiffs contend that construction ceased on this project for periods of time which would require the defendants to: (1) become subject to the requirements of the Tahoe Regional Planning Agency's Land Use Ordinance, and (2) acquire a new building permit and administrative permit for Washoe County, Nevada which would, in turn, also subject the project to the requirements of the Land Use Ordinance.

## A. *FACTUAL AND PROCEDURAL BACKGROUND*

In 1970, the predecessors in interest of defendant Crystal Enterprises began the process of adding a parking garage and 15-story hotel tower to the existing facilities of the Crystal Bay Club on Nevada's side of the north shore of Lake Tahoe. The Washoe County, Nevada Building Department granted a building permit for this construction on August 20, 1970. Shortly thereafter construction commenced and by the end of June, 1971, the parking garage and the structural portion of three floors of the hotel tower were completed. After the end of June, 1971, construction activity virtually ceased.

On June 5, 1972, the Building Department renewed the original building permit upon the payment of one-half the original fee. On July 5, 1972, separate and original permits were issued for some remodeling and fence construction. No renewal for the main permit was sought in 1973. On January 4, 1974, a renewal permit was issued and renewal permits have issued yearly thereafter.

In April of 1975, construction was restarted on the project. On May 28, 1975, this lawsuit was filed and in early June construction again ceased. After the lawsuit was begun, the Washoe County Building Department inspected the project each year to determine if sufficient work had been done before granting renewal of the original permit.

The Tahoe Regional Planning Agency's Land Use Ordinance became effective on April 11, 1972. Under this ordinance, the project at Crystal Bay Club is a nonconforming use. See § 7.12(15). However, the ordinance also contained a grandfather clause, § 9.11, which exempted from the requirements of the ordinance existing uses and projects "upon which construction has commenced as allowed by . . . permit prior to February 10, 1972. . . ." The exemption does not apply if "any such use ceases for a period of one (1) year." Id.

The plaintiffs alleged violations of both the TRPA Land Use Ordinance (hereafter LUO) and, as a pendent claim, violations of Section 302(d) of the Washoe County Uniform Building Code.[1] This court originally dismissed the suit for lack of subject matter jurisdiction under 28 U.S.C. § 1331(a). In *League to Save Lake Tahoe v. B.J.K. Corp.*, 547 F.2d 1072 (1976), the Ninth Circuit Court of Appeals reversed, finding that a suit involving interpretation of § 9.11 of the LUO raises a federal question sufficient to maintain jurisdiction under 28 U.S.C. § 1331(a) because the effective implementation of the regional plan requires uniform interstate interpretation of the TRPA ordinances.

## B. *VIOLATIONS OF THE TAHOE REGIONAL PLANNING AGENCY LAND USE ORDINANCE*

The question of whether the cessation of construction activity forfeited the grandfather clause exception can be separated into two sections: (1) whether or not construction is part of a use "to be created" under § 9.11, and (2) if so, whether or not construction actually ceased for one year or more on this project.

### I. *Construction and Use Under § 9.11.*

The defendants maintain that the unfinished structure is a nonconforming use not subject to review by the bi-state agency by

---

1. The Uniform Building Codes for the years 1967, 1970 and 1973 contain substantially identical language as to the expiration of permits:

 "(d) Expiration. Every permit issued by the Building Official under the provisions of this Code shall expire by limitation and become null and void, if the building or work authorized by such permit is not commenced within 20 days from the date of such permit, or if the building or work authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 120 days. Before such work can be recommended a new permit shall be first obtained so to do, and the fee therefor shall be one-half the amount required for a new permit for such work, provided no changes have been made or will be made in the original plans and specifications for such work; and provided, further, that such suspension or abandonment has not exceeded one year."

reason of the grandfather clause, § 9.11. Section 9.11, in its full and correct form,[2] states:

> "9.11 *Existing Uses and Structures*
>
> Uses of land and structures that do not conform to the regulations established by this Ordinance and which lawfully existed on February 10, 1972, or which are to be created in connection with structures for which a valid permit was issued on or before February 10, 1972 and upon which construction has commenced as allowed by such permit prior to February 10, 1972, may be continued, transferred or sold, *provided, however,* in the case of a use to be created it shall occupy no greater area than planned at the time such permit was issued. If any such use ceases for a period of one (1) year, subsequent use of such land shall be in conformity with the regulations contained in this Ordinance."

(emphasis in original.) Both sides agree that if use of a completed structure ceases for a period of one year or more, then the grandfather clause protection of the nonconforming use will be lost. The entire argument revolves around the cessation of construction work on a use "to be created." The plaintiffs maintain that the words "such use" in the last sentence include the course of construction required to create the future use. Under this interpretation, the cessation of construction for a period of one year or more would forfeit the exemption from TRPA review allowed by § 9.11. The defendants maintain that the course of construction is not included within the words "such use" and that it is irrelevant what happens during construction. The defendants' position is that the nonconforming use classification can only be lost once the structure is completed, used for its purpose and then that use abandoned for more than a year.

This issue presents a very difficult point of statutory construction. Nowhere in the LUO is "use" or "nonconforming use" defined. Both plaintiffs and defendants have asserted plausible arguments for their respective interpretations. The court finds the plaintiffs' arguments more convincing when looking at the ordinance as a whole and § 9.11 in particular. This interpretation is supported by *C.F. Lytle Co. v. Clark,* 491 F.2d 834 (10th Cir. 1974). Pitkin County, Colorado had a zoning ordinance which provided that

> "[w]henever a non-conforming use has been discontinued for a period of one year, such use shall not thereafter be re-established, and any further use shall be in conformance with the provisions of this resolution or any amendment thereof."

Id. at 837. The trial court found that the nonconforming use had been discontinued because construction had ceased and the developer had stopped communicating with the county building department for 5 years. The Court of Appeals upheld the trial court and added that intent to abandon the project is not required where the ordinance states a specific time limit. Id.

Although this particular issue was not as sharply presented in *Lytle* as it is here, there are several cogent arguments that indicate that a use "to be created" should be interpreted to include the course of construction necessary to arrive at the intended use.

First, it would seem there could be no rational purpose for treating projects under construction *less stringently* than completed structures. Yet this would be the necessary result of the defendants' interpretation. An existing nonconforming use, such as a hotel, would be subject to ordinance requirements if the use were suspended for a year. It might be far more difficult and expensive to modify an existing structure than to modify one in the course of construction. As a zoning ordinance aimed at regulating the *uses* of land, the LUO should be interpreted as treating completed structures and structures under construction equally, but certainly *not* with more leniency toward the more easily modified structures under construction.

---

**2.** The evidence showed that several forms of the LUO contain an omission of a phrase and a word. The version given above is the correct one as of February 10, 1972.

Second, it is one of the seminal policies of zoning law to restrict, rather than increase, nonconforming uses. Metzenbaum, *Law of Zoning*, Chap. X-g (2d ed. 1955). Accordingly, zoning ordinance language permitting nonconforming uses should be strictly construed insofar as it is constitutionally and reasonably possible to do so. See *Inhabitants of Windham v. Sprague*, 219 A.2d 548 (Me.1966). (It should be emphasized that the result of the interpretation adopted in this case is not the elimination of the nonconforming use [3] but merely the requirement that an administrative permit be obtained and be subject to TRPA review.) The corollary of the strict construction of language permitting nonconforming uses is the liberal construction of language limiting or regulating nonconforming uses. In our case, the limiting language of § 9.11 withdraws the exemption allowed for nonconforming uses where "any such use" ceases for one year. A liberal construction of the limiting language is that the course of construction required to achieve a use is part and parcel of that use and a cessation of construction is a cessation of a use "to be created."

Third, a close examination of the grammatical structure of § 9.11 supports the interpretation urged by the plaintiffs.

"9.11 *Existing Uses and Structures*

Uses of land and structures that do not conform to the regulations established by this Ordinance and which lawfully existed on February 10, 1972, or which are to be created in connection with structures for which a valid permit was issued on or before February 10, 1972 and upon which construction has commenced as allowed by such permit prior to February 10, 1972, may be continued, transferred or sold, *provided, however,* in the case of a use to be created it shall occupy no greater area than planned at the time such permit was issued. If any such use ceases for a period of one (1) year, subsequent use of such land shall be in conformity with the regulations contained in this Ordinance."

(emphasis in original.) The first sentence in the paragraph identifies two types of uses: (1) nonconforming uses already in lawful existence on February 10, 1972, and (2) uses to be created for which a valid permit was issued before February 10, 1972, and on which construction had commenced prior to February 10, 1972. The second sentence begins with the phrase "If any such use . . . ." The grammatical antecedents of the referent "any such use" are the two types of uses identified in the first sentence. Thus the second sentence means that if a # 1 type of use or a # 2 type of use ceases "for a period of one (1) year, subsequent use of the land shall be in conformity with the regulations contained in (the) Ordinance."

As to an existing use of a structure, the meaning of this second sentence is clear. As to a use to be created, however, one might wonder how a use that does not yet exist could "cease" for one year. If the defendants' interpretation were adopted, it would require exactly that nonsensical construction. If, however, the course of construction is included conceptually in the use "to be created", the sentence makes sense, for the *construction* could stop for a year. In that case the future use becomes subject to ordinance regulations.

II. *The Cessation of Construction Activity.*

Representatives of the Washoe County Building Department testified that the De-

---

3. Zoning ordinances requiring elimination of nonconforming uses after a certain period of disuse have been upheld, *Beszedes v. Board of Commissioners of Arapahoe County*, 116 Colo. 123, 178 P.2d 950 (1947); *Canada's Tavern Inc. v. Town of Glen Echo*, 260 Md. 206, 271 A.2d 664 (1970); *City of Monnett v. Buchanan*, 411 S.W.2d 108 (Mo.1967); *Marchese v. Norristown Borough Zoning Board of Adjustment*, 2 Pa.Cmwlth. 84, 277 A.2d 176 (1971), as have ordinances which flatly require the termination of a nonconforming use after due notice and a reasonable amortization period, *Standard Oil Co. v. City of Tallahassee*, 183 F.2d 410 (5th Cir. 1950), *cert. denied*, 340 U.S. 892, 71 S.Ct. 208, 95 L.Ed. 647 (1950); *Livingston Rock & Gravel Co. v. County of Los Angeles*, 43 Cal.2d 121, 272 P.2d 4 (1954); *Wolf v. City of Omaha*, 177 Neb. 545, 129 N.W.2d 501 (1964).

partment's interpretation of UBC § 302(d)'s language regarding suspension or abandonment of work on a project for 120 days was that if one nail were driven on the project every 120 days there would be no suspension of work. However, the Ninth Circuit has directed this court to make independent interpretations of LUO § 9.11 as a matter of federal law. Being free to make its own interpretation, this court rejects the lax interpretation adopted by Washoe County as an appropriate standard for interpreting what constitutes cessation of construction under LUO § 9.11.

 Construction has ceased on a project within the meaning of § 9.11 if no substantial work has been done in furtherance of the original permit or any valid renewals of the original permit. What is "substantial work" in furtherance of the original permit will vary from case to case. But where, as here, the work amounted to nothing much more than sweeping the floors or occasionally driving a nail, that work is not sufficient.

The evidence indicated that there was a cessation of construction from March of 1973 to January 2 of 1975, a period substantially exceeding one year. The course of construction is part of a use "to be created" under § 9.11. Since no substantial work in furtherance of the permit occurred from March, 1973 to January, 1975, the use to be created ceased for more than one year within the meaning of § 9.11.

### III. *§ 9.11's Requirement of a Valid Permit.*

Section 9.11 provides that, in relation to construction for a use to be created, "a valid permit . . ." must have been issued before February 10, 1972 and that construction must have actually "commenced as allowed by such permit . ." before February 10, 1972. Taken together with the conclusion that the course of construction is part of a use "to be created", § 9.11's requirement of the issuance of a valid permit and the commencement of construction pursuant to that permit necessarily implies that a valid permit must be maintained during construction so as to protect

the exemption granted by the grandfather clause. The further implication is that the *only* construction protected by § 9.11 is construction allowed by or pursuant to a valid permit.

It is, then, a significant question of federal interpretation as to what constitutes a valid permit under § 9.11. The Tahoe Basin contains portions of three Nevada counties and two California counties. Each county adopts its own ordinances regarding building permits. The Ninth Circuit stated in a previous appeal of this case that interpretation of the LUO § 9.11 is a federal question because:

> "[d]iffering interpretations by state courts of the impact of the grandfather clause on lapsed use or on interrupted construction of highrise buildings in the Tahoe basin could impair the effectiveness of the regional plan."

*League to Save Lake Tahoe v. B.J.K. Corp.,* 547 F.2d at 1075. The same reasoning applies to the interpretation of components of the grandfather clause such as what is a "valid permit."

The Land Use Ordinance contains substantial delegations of responsibility to the local permit-issuing authorities. A "permit-issuing authority" is defined as follows:

> "The local government within the territory of which the land use district, land capability district, proposed construction, use or land coverage is located, which government has the authority and obligation to enforce the standards established by this Ordinance."

Section 4.00 of the LUO deals with permit procedure. Section 4.10 (in its 1972 form) provided:

> "No person shall undertake or carry out any of the following activities without first obtaining a permit from the permit-issuing authority:
>
> (1) Any construction or use involving the creation of land coverage on an area greater than 200 square feet;
>
> (2) any construction or use for which an administrative permit or variance permit as required by this Ordinance

must first be issued by the permit-issuing authority."

Subsection (1) encompasses building permits, while subsection (2) applies to administrative and variance permits. Section 4.21 requires applications for both kinds of permits and states: "No permit shall be issued unless there is compliance with all the requirements of this Ordinance." (Parenthetically, section 9.11 imposes such a requirement). Section 4.33 requires written notice to the TRPA of all applications for permits, and while section 4.31 does not require Agency review of section 4.10(1) building permits, notice must be given not only of the application but also of the issuance by the permit-issuing authority of every permit for any construction or use within the Lake Tahoe basin. The Agency staff is required to review all permits for compliance with the LUO and section 4.31 respecting building permits provides: "the fact that a permit becomes final without the necessity of review by the Agency shall not foreclose any judicial action authorized by the Tahoe Regional Planning Compact to enforce the provisions of this Ordinance."

In the present case none of these notice and review procedures were complied with by defendant's predecessors in interest and by the Washoe County Building Department during the ten years applications were received and processed for the issuance of the building permits. Thus, the Agency during the years had no opportunity to determine whether Washoe County's procedures were in compliance and whether action should be instituted to enforce the time limitations of section 9.11.

 Washoe County, Nevada, at all times relevant to this suit, had in force one version or another of the Uniform Building Code (UBC). In fact, the UBC appears to be in use in most, if not all, of the counties in the Lake Tahoe basin. The provisions of the UBC govern the issuance and continued validity of building permits. Since these specific regulations exist, there is no necessity, even were there to be considerable diversity among the various counties' actual regulations, to fashion some federal common law of building permits. Cf. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). The primary requirement for the existence of a valid permit, then, would be compliance with the provisions of the county's building regulations. As this case demonstrates, however, there can be considerable differences of opinion concerning what certain terms mean in those regulations. As a matter of federal law in interpreting § 9.11, the county building regulations must be interpreted in a reasonable way so as to conform to the policy and purposes of the grandfather clause.

Washoe County's interpretation of UBC § 302(d) is not reasonable. According to the testimony at trial, the building department would renew the original permit indefinitely as long as one nail was driven on the project every 120 days. Such an indefinite prolongation of the construction process, especially on a project of this size, clearly frustrates the general purposes of LUO expressed in § 7.11 and elsewhere. Section 9.11's treatment of in-progress construction appears to be intended as a transitional measure to prevent unfairness. The inclusion of the one-year limitation on cessation of existing nonconforming uses and nonconforming uses to be created is clear evidence that the drafters of LUO did not contemplate an indefinite transition period. A common-sense and reasonable interpretation of § 302(d) is that unless some substantial work in furtherance of the permit is done every 120 days, work has been "suspended" and the permit expires by its own limitation. Intent to abandon is not a required element where the regulation expresses a specific time limit. *C.F. Lytle Co. v. Clark*, 491 F.2d at 837.

For the purposes of federal law in interpreting § 9.11, then, Washoe County's interpretation of UBC § 302(d) is unreasonable and under a reasonable interpretation of that section, work was suspended and the original permit expired. As discussed in the previous section, no substantial work in furtherance of the original permit was carried out for a period exceeding one year.

Any new permit issued in these circumstances would be an administrative permit under LUO § 3.00. Crystal Enterprises could not recommence construction without obtaining such a permit (LUO § 4.10) and without such permit being subject to TRPA review pursuant to LUO § 4.32.

### C. VESTED RIGHTS

██ Defendant Crystal Enterprises asserts that even if § 9.11 is construed to mean that it has lost the protection of the grandfather clause, it still cannot be made subject to LUO because it has a vested right to complete the project. Whether or not Crystal Enterprises has a vested right to complete the project is not, however, a question that is ripe for judicial determination at this time. The defendant must first exhaust its administrative remedies by applying for an administrative permit from Washoe County, subject to review by the TRPA, pursuant to the LUO. Only if, at some point in this process, it is denied permission to continue the project, will the defendant have a ripe claim regarding possible vested rights, and the issue of vested rights is also one that can be taken into consideration in the administrative process.

Moreover, the validity of the current building permit may also have bearing upon the question of vested rights. Cf. *Eastlake Community Council v. Roanoke Assoc., Inc.*, 82 Wash.2d 475, 513 P.2d 36 (1973).

The Seventh Circuit was concerned with an analogous situation in *United States v. Byrd*, 609 F.2d 1204 (1979). The court held that:

> "If Byrd applies for a permit and the Corps [Army Corps of Engineers] then issues it, Byrd would have no further complaint. If the Corps denies his permit application . . . Byrd may seek judicial relief if warranted. In essence, Byrd must exhaust his administrative remedies. . . ."

Id. at 1211. This court's decision does not, by itself, deprive the defendant of any supposed vested right.

In consideration of the above premises, it hereby is ordered, that:

Defendant Crystal Enterprises and any successors in interest be, and hereby are, enjoined from any further new construction on the project (repairs and maintenance of the existing structure excepted) until the defendant acquires a valid building permit from the county, and until the defendant acquires an administrative permit from the county, subject to TRPA review pursuant to § 4.32.

This opinion shall constitute findings of fact and conclusions of law under Fed.R. Civ.P. 52(a).