### The AVOYELLES SPORTSMEN'S LEAGUE, INC., et al.

v.

### Clifford L. ALEXANDER et al.

### Civ. A. No. 78–1428.

United States District Court,
W. D. Louisiana,
Alexandria Division.

March 12, 1981.

Donald R. Wilson, Gaharan, Richey & Wilson, Jena, La., for all plaintiffs.

James B. Tripp, New York City, for Environmental Defense Fund.

Michael Osborne, Smith & Osborne, New Orleans, La., for Environmental Defense Fund and National Wildlife Fed.

F. Walter Conrad, Houston, Tex., for intervenors Ophelia Lake & Bayou Lafourche, and for defendants, Lambright & Prevot.

William D. Brown, Monroe, La., David B. Beers and Nancy C. Shea, Richard S. Wasserstrom, Nat'l Forest Products Assn., Washington, D. C., for amicus curiae— American Paper Institute, the National Forest Products Assn., and the Louisiana Forestry Assn.

Frances O. Allen, Shreveport, La., for all government defendants.

Charles K. Reasonover, Deutsch, Kerrigan & Stiles, New Orleans, La., for defendant Elder Realty Co.

Louis D. Curet, D'Amico & Curet, Baton Rouge, La., for amicus curiae—Louisiana Farm Bureau Federation, Inc.

Dan E. Melichar, Gravel, Robertson & Brady, Alexandria, La., for defendant H. P. Lambright.

Edwin R. Woodman, Baton Rouge, La., for intervenor Department of Natural Resources.

Joseph E. LeBlanc, Jr., Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for intervenors Louisiana Landowners Assn.

Fred R. Disheroon and Nancy L. Long, Dept. of Justice, Catherine A. Winer, U. S. Environmental Protection Agency, Washington, D. C., for all federal defendants.

## OPINION

NAUMAN S. SCOTT, Chief Judge.

Plaintiffs [1] brought this declaratory and injunctive action alleging that land-clearing operations being carried on by the private defendants [2] have and will: alter and modify the course, condition and capacity of the navigable waters of the United States in violation of § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C.A. § 403; result in the discharge of dredged and fill material into the waters of the United States in violation of § 404 of the Clean Water Act (hereinafter CWA), 33 U.S.C.A. § 1344; result in the discharge of pollutants into the waters of the United States in violation of § 402 of the CWA, 33 U.S.C.A. § 1342; and violate Louisiana State law under Louisiana Civil Code arts. 667 and 857. The plaintiffs requested that we compel the federal defendants [3] to regulate the land-clearing activi-

1. The Avoyelles Sportsmen's League, Inc., Point Basse Hunting Club, Inc., Avoyelles Bass Runners, Inc., Ira J. Marcotte, Avoyelles Natural Guard, Inc., The Environmental Defense Fund, Inc., and The National Wildlife Federation.

2. Albert Prevot, H. P. Lambright and Elder Realty Co., Inc. Additional parties, The State of Louisiana, Louisiana Land Owners Association, Inc., Ophelia Lake, Inc., Bayou Lafourche, Inc., George Bartmess, Roger J. Smith, James E. Ragsdale, Dale Rogers & Sons, Inc., and Tilden Plantation, Inc., have intervened since the rendition of our opinion covering the first phase of

this proceeding and, for the purposes of this final opinion are included in the designation, private defendants, but are not land owners and are not therefore covered by the injunctive relief granted in the opinion covering the first phase of this proceeding.

3. Clifford L. Alexander, Secretary of the Army, John W. Morris, Chief of Engineers, U. S. Army Corps of Engineers, Colonel Robert L. Moellering, Vicksburg District Engineer, U. S. Army Corps of Engineers, Douglas Costle, Administrator of the U. S. Environmental Protection Agency, and Adlene Harrison, Regional Administrator of the U. S. Environmental Protection Agency.

ties and enjoin the land-clearing activities until the extent of the federal defendants' jurisdiction has been determined and permits applied for under 33 U.S.C.A. §§ 403, 1342 and 1344.

The land subject to this proceeding and being· cleared is an approximately 20,000 acre tract (hereinafter referred to as the Lake Long Tract) situated in Avoyelles Parish, Louisiana between the Grassy Lake State Management Area and the Spring Bayou State Management Area. It lies within the Bayou Natchitoches basin which, along with the Ouachita, Black and Tensas river basins, makes up the Red River backwater area. The Bayou Natchitoches basin itself is an area comprised of approximately 140,000 acres. Much of this basin has been cleared of forest but before the private defendants' land-clearing operations commenced, approximately 80,000 acres of this area still was forested. Consequently, prior to the commencement of the private defendants' land-clearing operations, the Lake Long tract represented one-quarter of the remaining forested acreage in the Bayou Natchitoches basin.

The clearing of the Lake Long tract began in June of 1978. Sometime prior to that loggers had harvested much of the commercially valuable hardwoods with chainsaws. Thereafter, the private defend-. ants took various steps to remove all the remaining trees and vegetation from the tract so that it could be put to agricultural use and specifically into soybean production.

On November 7, 1978 we granted a temporary restraining order whereby the private defendants were prohibited from engaging in any further land-clearing activity. More specifically, they were prohibited from conducting ditch excavation, altering the surface of the land, logging, except by chainsaw, destroying vegetation, plowing, discing, or discharging any biologic material or pollutants onto the land. They were permitted to clean up debris already on the ground.

On January 17, 1979 it was ordered that the federal defendants prepare a final wetland determination within sixty days. The private defendants were permitted to engage in normal cultivation, plowing and seeding without obtaining a permit on the land already cleared, approximately 10,000 acres. The private defendants were ordered to and agreed under protest, to apply for permits under § 404 for any ditching, levee construction and drainage work construction on the land already cleared. As to the uncleared land, the prohibitions of the temporary restraining order remained unchanged.

On March 26, 1979 the federal defendants filed their final wetland determination which designated certain portions of the tract, including substantial portions of the cleared lands, to be wetlands. Thereafter the private defendants filed objections to this determination.

The wetland determination also contained a statement concerning what activities of the private defendants were subject to the permit requirements of § 404, 33 U.S.C. § 1344. This was the subject of our judgment of June 9, 1979, *The Avoyelles Sportsmen's League, et al. v. Alexander, et als.*, 473 F.Supp. 525 (W.D.La.1979). We must now consider the ultimate issue which was bifurcated and therefore not covered in our opinion of June 9, 1979: Was the Government's final wetland determination filed by the Federal defendants on March 26, 1979, correct so that the area designated therein as wetlands (shown in green on the survey attached thereto) is subject to the strictures of the CWA? Stated another way: Is the Lake Long tract included in "waters of the United States" and more particularly, does it constitute a "wetlands" within the meaning of the regulations promulgated by the Corps under the § 404 program?

### FINDINGS OF FACT

1) The Lake Long Tract (approximately 20,000 acres) is located in the Bayou Natchitoches basin consisting of approximately 140,000 acres and along with the Ouachita,

Black and Tensas River basins, makes up the Red River backwater area.

2) The Bayou Natchitoches basin serves as a major overflow or backwater area for Red River. When the Red River rises, its waters flow westward through bayous, principally Bayou Natchitoches and across the Lake Long tract. This back flooding occurs in the Spring of each year at varying times during the months of March, April, May and occasionally the first part of June. Three major backwater floods have occurred during the 1970s.

3) Rainfall in the Bayou Natchitoches basin averages almost 60 inches a year, the heaviest rainfall occurring during the months of December, January, February, March, April and May. Since the rainfall drains easterly across the Lake Long tract and into Bayou Natchitoches and the Red River, it adds to the waters on the Lake Long tract especially during times of backwater flooding which occurs during these same months.

4) The topography of the Lake Long tract is very uneven with swells and ridges which impede drainage and bring about the formation of standing water sloughs and permanent water impoundments such as Lake Long, Lake Ophelia, West Cut Lake, Mouillier a Yor, Mouillier Swamp, Lake Claire, Lac a Paul, Lac Byrondas Chats, Lac Volee, Lac Calebasse, Nichols Lake, Lac

Barbue and Pointe Basse (Soils map—Gov. G). Sediment has formed ridges along the streams in the area and the ridges on each side of Lake Long divide the northern portion of that tract from the southern in terms of water movement. Drainage of the northern area eastward through Three Mile Bayou is intermittent and much poorer than the drainage on the south. The drainage on the south through Bayou Jeansonne to Bayou Natchitoches is somewhat better though impeded by the decreased channel size of Bayou Jeansonne. The type of soil on the tract is an additional drainage difficulty.

5) The Lake Long tract ranges in elevation from below 40 feet mean sea level (msl) to over 55 feet msl at the ridges. The one year frequency flood [4] is estimated to be 45.8 feet (46 feet msl); the one to one and a half year frequency flood, 47 feet msl; the one and a half year frequency flood, 48 feet msl, and the two year frequency flood, 49.6 feet msl.

6) The minimal flood duration [5] for elevations at or below 40 feet msl is 70%; this would inundate approximately 1323 acres on the Lake Long tract; for elevation 45 feet msl, 13% (approximately 10,188 acres); for elevation 50 feet msl, 4% (approximately 18,556 acres); and for elevation 55 feet msl, 1% (approximately 20,949 acres). These calculations do not include the duration of soil saturation which continues after surface flooding has subsided.

4. The one-year frequency flood is that flood which, statistically, over a long period of time, can be expected to occur every year. It is calculated by reference to historical flood data, but it is not exactly an averaging of the floods that occur every year. It covers that area of land which can be expected to be inundated by the one-year flood.

5. What the flood duration means is that at a given elevation, water will inundate the area for a particular percentage of the time. Thus on the Lake Long tract, the elevation 40 feet msl will be equalled or exceeded 70% of the time by flood waters; this is based on historical data. The flood duration is not an annual average, but it is not unreasonable to say that there would be flooding at elevation 40 feet msl for 70% of the time each year. In other words, over the historical period, from which the data is compiled, for 70% of the time the elevation 40 feet msl was once under water. As we

understand it, witness Phil Combs, Chief of the Hydrology Section of the Vicksburg District Corps of Engineers, who made these calculations, did not take into account actual rainfall onto the Lake Long tract. He did what is known in the hydrology profession as a routing. Rainfall from areas west of the Lake Long tract were scientifically converted into stream flow across the tract, apparently because drainage from those areas is onto the tract. The routing was then correlated with river stages to arrive at estimates of flooding frequency and duration. He took into account rainfall runoff and backwater flooding but his consideration of topography in the area was minimal.

Dr. Van Beek's water levels were somewhat higher than Combs' because he took into account actual rainfall on the Lake Long tract, the drainage characteristics, the impoundments of water, and soil saturation characteristics which slow the drainage.

7) All the soils in the Lake Long tract are wetland soils with the possible exception of soils along the Red River and the Lake Long ridge, i. e. Roxanna, very fine sandy loam, gently undulating (61) and Norwood silty clay loam, occasionally flooded (52). The data on these soils was inadequate. There were substantial disputes regarding the wetlands character of the following soils:

(19) Dundee silty clay loam, occasionally flooded;

(53) Sharkey clay, overwash, occasionally flooded;

(54) Sharkey clay, overwash, gently undulating, occasionally flooded;

(55) Tensas silty clay, overwash, occasionally flooded;

(57) Tensas-Sharkey complex, overwash, undulating, occasionally flooded.

We find these to be wetland soils because:

(a) Moisture regime—aquic regime assuring that dissolved oxygen is virtually absent;

(b) Drainage classification—described alternatively as "somewhat poorly drained"; "poorly drained due to high water table to slow permeable layer within profile to seepage or a combination of these conditions" and "somewhat poorly drained" due to much the same conditions.

(c) Capability classification—very severe limitations because of excess water that restrict the choice of plants and require careful management or both; poor soil drainage, wetness, high water table and overflow.

(d) Mottling—Colorations in the soils which reflect alternating periods of no free oxygen in the soil (reduced conditions) and periods of free oxygen (oxidated conditions). No mottles are present unless there has been some saturation of the soil. This is possibly the best indication of the saturated character of the soils on the Lake Long tract.

(e) Lay description—Soil Conservation Service data describes these soils in terms of their farming potential in a manual specifically developed for Avoyelles Parish. The descriptions are an obvious indication of the wetland character of these soils. (SCS Manual).

When these soils become flooded they remain saturated over a more extended period of time than other types of soils. Because of their extended anaerobic (lack of free oxygen available for roots) condition when flooded only certain species of vegetation can adapt and survive. Certain vegetation can tolerate and survive very extended periods of saturation, others can survive intermittent and less extended periods, upland vegetation cannot adapt, and therefore cannot tolerate and survive even the intermittent and less extended periods.

8) A prevalence of [6] the following plant species appear on the Lake Long tract.

| SPECIES | WHITLOW & HARRIS | TESKEY & HINCKLEY |
|---|---|---|
| American Elm | ST | T |
| Bald Cypress * | VT | VT |
| Bitter Pecan | VT | ST |
| Black Willow * | VT | VT |
| Box Elder | ST | T |
| Button Bush * | VT | VT |
| Deciduous Holly | VT | VT |
| Drummond's Red Maple | T | T |
| Eastern Cottonwood | T | VT |
| Green Ash | VT | VT |

6. Throughout this proceeding all persons concerned have found it more convenient to refer to a community of certain species or vegetation rather than "a prevalence of vegetation" which is the term used in both the 1975 and 1977 definition of wetlands.

| SPECIES | WHITLOW & HARRIS | TESKEY & HINCKLEY |
|---|---|---|
| Hathorn | ST | ST |
| Honey Locust | ST | ST |
| Nuttal's Oak | VT | T |
| Overcup Oak | VT | T |
| Persimmon | T | T |
| Sugarberry | T | ST |
| Swamp Privet * | VT | VT |
| Swamp Tupelo | ST | VT |
| Sweet Gum | T | T |
| Sycamore | ST | T |
| Water Elm * | VT | T |
| Water Locust | VT | |
| Water Oak | ST | T |
| Water Tupelo * | VT | VT |
| Willow Oak | ST | T |

Studies of the flood tolerance of various plant species have been made by Whitlow & Harris[7] and by Teskey & Hinckley.[8] Their tolerance classification for each species is shown in the table above. Private defendants' principal witness, Dr. Donald Rhodes, retained as a botanical consultant by the Vicksburg District of the Corps of Engineers (also Thomas, Hook & McKnight) are of the opinion that Bald Cypress, Black Willow, Button Bush, Swamp Privet, Water Elm and Water Tupelo (indicated by asterisks) are the only wetland plant species.

9) Bald Cypress, Black Willow, Button Bush, Swamp Privet, Water Elm and Water Tupelo exist in community only in deep swamp or cypress swamp areas; areas which are inundated and water dominated most of each year. The other species mentioned in Paragraph 8 above cannot survive such extended periods of inundation and/or saturation but can survive substantially shorter periods of intermittent inundation and saturation. All species have survived in community through the periods of inundation and saturation experienced on the Lake Long tract.

10) The Lake Long tract can be cleared, disced, leveled, ditched and improved for soybean cultivation. A soybean crop can be made even though it is planted as late as June 15th. Indeed, much of the Lake Long

7. Whitlow & Harris (Whitlow & Harris, Flood Tolerance in Plants: A State-of-the-Art-Review, Final Report, U. S. Army Corps of Engineers Waterways Experiment Station, Technical Report E–79–2, August 1979) classify plants as (1) very tolerant (VT)—able to survive deep, prolonged flooding for more than one year; (2) tolerant (T)—able to survive deep flooding for one growing season, with significant mortality occurring if flooding is repeated the following year; (3) somewhat tolerant (ST)—able to survive flooding or saturated soils for 30 consecutive days during the growing season; and (4) intolerant—unable to survive more than a few days of flooding during the growing season without significant mortality.

8. Teskey & Hinckley (Teskey & Hinckley, Impact of Water Level Changes on Woody Riparian and Wetland Communities, U. S. Fish & Wildlife Service, Vols. I and II, December 1977) classify plants as (1) very tolerant (VT)—able to withstand flooding for periods of 2 or more growing seasons; exhibit good adventitious or secondary root growth during this period; (2) tolerant (T)—able to withstand flooding for most of one growing season; exhibits some new root development during this period; (3) intermediately tolerant (IT)—able to survive flooding for periods between one to three months during the growing season; exhibits few new roots or dormant roots during this period; and (4) intolerant—unable to withstand flooding for short periods (one month or less) during the growing season; the root system will die during this period.

tract has already been cleared and is in soybean cultivation. In fact, any lowland and even lakes can be converted to agriculture with the proper engineering improvements. This is the problem being met by the CWA. We do not consider it an appropriate criteria to determine what is or is not a wetlands.

## CONCLUSIONS OF LAW

### A. CONSTITUTIONAL ISSUE

Congress has declared the goals and policy of the CWA § 101(a), 33 U.S.C. § 1251(a), to be as follows:

"(a) The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter—

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved, by July 1, 1983;

* * * "

■ These lofty ecological goals could not be achieved through the limited jurisdiction (ordinary high water mark) traditionally exercised by the Corps of Engineers (Corps). Such jurisdiction is inadequate to the purpose. The Corps' explanation following the promulgation of the 1977 revisions stated:

"WETLANDS. Prior to enactment of the FWPCA ... In freshwater lakes, rivers and streams that are navigable waters of the United States the landward limit of jurisdiction has been traditionally established at the ordinary high water mark.

"The regulation of activities that cause water pollution cannot rely on these artificial lines, however, but must focus on all waters that together form the entire aquatic system. Water moves in hydrologic cycles, and the pollution of this part of the aquatic system, regardless of whether it is above or below an ordinary high water mark, or mean high tide line, will affect the water quality of the other waters within that aquatic system.

"For this reason, the landward limit of Federal jurisdiction under Section 404 must include any adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States, as these wetlands are part of this aquatic system." Fed.Reg., Vol. 42, No. 138, p. 37128 (1977).

Congress was acutely aware of this and in drafting Section 502(7) of the Federal Water Pollution Control Act (now CWA), 33 U.S.C. § 1362(7), deliberately moved away from the earlier restrictive definitions of navigable waters. "The conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." S.Conf.Rep.No.1236, 92d Cong., 2d Sess. 144, reprinted in (1972) U.S.Code Cong. & Ad. News, 3776, 3822.[9]

■ Although 101(a)(1) refers to the discharge of pollutants in the "navigable waters", it is clear that Congress was not referring to "navigable waters" in the usual physical sense. In fact the statutory definition mentions no physical characteristics such as width, depth, volume or flow. It mentions none of the characteristics normally associated with navigability such as "ebb and flow of tide" or "high water mark" or "low water mark". The CWA defines "navigable waters" in terms consistent with Congress' stated objective to re-

---

9. Other parts of this 1972 legislative history (statements by Sen. Muskie and Rep. Dingill) indicate a congressional intent to limit jurisdiction to waters which are today "navigable in fact." However, litigation and legislative history since 1972 have rendered this portion of the statement obsolete.

store and maintain the chemical, physical and biological integrity of the Nation's waters. The report of the House Committee on Public Works which accompanied the House bill, defined "integrity to mean a condition in which the natural structure and function of ecosystems is maintained. H.Rep.No.92–911, 92nd Cong. 2d Sess. 76–77 (1972), reprinted in 1 Legislative History 753, 763–64. In enacting the 1972 Amendments to the Federal Water Pollution Control Act (now CWA), Congress "intended to extend the Act's jurisdiction to the Constitutional limit." *Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 755 (9th Cir., 1975); *State of Minnesota v. Hoffman,* 543 F.2d 1198, 1200 n. 1 (8th Cir., 1976), *cert. denied* 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1976); *People of the State of California v. Environmental Protection Agency,* 511 F.2d 963, 964–965 n. 1 (9th Cir., 1975), *rev'd on other grounds,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *United States v. Ashland Oil and Transportation Co.,* 504 F.2d 1317, 1324 (6th Cir., 1974); *United States v. Holland,* 373 F.2d 665, 671 (M.D.Fla., 1974); *Natural Resources Defense Council v. Callaway,* 392 F.Supp. 685, 686 (D.D.C.1975).

■ Congress effectively implemented its intent (1) to extend the Act's jurisdiction to the Constitutional limit, (2) to extend the broadest protection possible to the nation's full hydrologic cycle, (3) to provide for the protection and propagation of fish, shellfish, and wildlife and to provide for recreation in and on the water when it defined the term "navigable waters" in § 502(7), 33 U.S.C. § 1362(7) as follows:

"(7) The term 'navigable waters' means the waters of the United States, including the territorial seas."

It has been recognized that pollution, including § 404 pollution, can be regulated only at the source of that pollution, *United States v. Holland, supra;*[10] *Puerto Rico v. Alexander,* 438 F.Supp. 90 (D.C.1977). The definition, as we shall see, is broad enough to allow such control.

Congress has broad powers under the Commerce Clause, Art. 1, § 8, Constitution of the United States. In *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), Chief Justice Stone stated:

"The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce. See *M'Culloch v. Maryland,* 4 Wheat. 316, 421, 4 L.Ed. 579, 605."

Congress has utilized the Commerce Clause to extend its power to essentially local activities involving fraudulent security transactions, *Securities & Exchange Comm'n v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); to deceptive practices in the sale of products, *Federal Trade Comm'n v. Mandel Bros., Inc.,* 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); to resale price maintenance, *Hudson Distributors, Inc. v. Eli Lilly & Co.,* 377 U.S. 386, 84 S.Ct. 1273, 12 L.Ed.2d 394 (1964); to professional football, *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); to public accommodation practices, *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); and to loanshark lend-

---

10. Although *U. S. v. Holland, supra,* is concerned with coastal terrain, the following language is singularly applicable to wetlands in general:

"(9). The Court is of the opinion that the mean high water line is no limit to federal authority under the FWPCA. While the line remains a valid demarcation for other purposes, it has no rationale connection to the aquatic ecosystems which the FWPCA is intended to protect. Congress has wisely determined that federal authority over water pollution properly rests on the Commerce Clause and not on past interpretations of an act designed to protect navigation. And the Commerce Clause gives Congress ample authority to reach activities above the mean high water line that pollute the waters of the United States." At p. 676.

ing practices, *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). Each of these cases, and many others like them, are examples of local intrastate activity which affect interstate commerce and are subject to the powers of Congress.

■ It has been established also that jurisdiction under the Act had to be broad in order to accomplish its stated purpose. But it does not follow from this that the Act is vague. There is a strong presumption in favor of the validity of an act of Congress. *United States v. National Dairy Products*, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). We are less inclined to strike down a congressional enactment on grounds of vagueness, where the statute involves a regulatory measure rather than constitutionally protected rights. *U. S. v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Where, as here, the breadth of the Act is necessary to accomplish its purpose, and is reasonably related to that purpose, it is not unconstitutionally vague, *U. S. v. Phelps Dodge Corp.*, 391 F.Supp. 1181 (D.C. Ariz.1975),[11] *U. S. v. Powell*, 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975); *M. Krause & Bros., Inc. v. United States*, 327 U.S. 614, 66 S.Ct. 705, 90 L.Ed. 894 (1946).

## B.  HIGHEST AND BEST USE .

■ The fact that the Lake Long tract could be more valuable if converted to soybean cultivation or that such cultivation may be its "highest and best use" is not pertinent here. Designation as a "wetlands" under the provisions of the CWA does not amount to a taking for which compensation may be due. The CWA was designed by Congress to effect a legitimate economic and social policy. It has not been shown that the considered judgment of Congress in passing that Act is not reasonable, legitimate and in the public interest.

*Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); and *Maher v. City of New Orleans*, 516 F.2d 1051 (5th Cir., 1975), *cert. denied* 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976). Therefore, the enforcement of the § 404 regulation is not a "taking" for which compensation is due.

## C.  HISTORY AND METHODOLOGY

In order to demonstrate the methodology used by us in applying the "wetlands" definition to the Lake Long tract, we find it necessary to give a brief history of the CWA, part of which history may be repetitive. As stated previously, Congress intended to extend the jurisdiction of the Federal Water Pollution Control Act (now CWA) to the constitutional limit. Yet the regulations of the Department of the Army did not reflect such broadened jurisdiction:

> "As part of the revisions to its April 3, 1974 permit regulation, the Department of the Army published regulations to implement the Section 404 permit program. These regulations limited the Section 404 permit program to the same waters that were being regulated under the River and Harbor Act of 1899: waters that are subject to the ebb and flow of the tide shoreward to their mean high water mark (mean higher water mark on the West Coast) and/or waters that are presently used, were used in the past, or are susceptible to use to transport interstate or foreign commerce." Fed.Reg., Vol. 42, No. 138, p. 37123 (1977).

Meanwhile, courts interpreted the Act to afford jurisdiction sufficient to accomplish the goals and policy of the Act; i. e. jurisdiction over "waters of the United States" including wetlands. The Corps consistently interpreted the term "waters of the United

---

11.  "For the purpose of this Act to be effectively carried into realistic achievement, the scope of its control must extend to . . . any waterways, including normally dry arroyos, where any water which might flow therein could reasonably end up in any body of water to which or in which there is some public interest . . . Obvi-

ously, Congress did not specifically define the term 'waters of the United States'. The task . . . is whether the term is sufficiently clear or definite and certain as to give fair warning of the conduct that is criminal." *U. S. v. Phelps Dodge Corp.*, 391 F.Supp. 1181 (D.C.Ariz.1975) at 1187.

States" to cover only those waters which are subject to the ebb and flow of the tide or were, or could be made navigable in fact. The EPA, on the other hand, insisted that the definition of those waters was specifically intended to replace the traditional definition with one which would grant the broad jurisdiction necessary to achieve effective Section 404 pollution control. The courts adopted the latter point of view and finally on March 27, 1975 the Court in *Natural Resources Defense Council v. Callaway, supra,* ordered that the Corps regulations be revised and broadened.[12] Thereafter, the Corps, with the help of other Federal agencies, issued its interim final regulations on July 25, 1975, broadening the definition of "waters of the United States" to include certain types of land above the mean high water mark including "fresh water wetlands." Nevertheless, because of the pressure of many farm, forestry and land development groups, there were continued efforts to amend the Federal Water Pollution Control Act to redefine the term "navigable waters" in a more traditional and restrictive sense. These efforts were reflected by the proposed Breaux amendment; Wright amendment; an Administration amendment; the Baker amendment and the Baker-Randolph amendment, all of which were considered by Congress in 1976. None passed. The Corps had received many comments on its final interim regulations and on July 19, 1977 issued its final regulations redefining "waters of the United States" and "wetlands". On December 27, 1977 Congress passed the Clean Water Act which amended the Federal Water Pollution Control Act in many respects and significantly did not affect or modify the provisions of the final regulations.

■ It is quite obvious from this history that the terms "waters of the United States" and "wetlands" are not terms of pure science. They are not meant to be. "Wetlands" is a jurisdictional term, the product of the legislative process, of political pressure groups. The plaintiffs in this proceeding are representative of those who have fought historically to expand Section 404 jurisdiction to promote pollution control. Private defendants are representative of those who have fought historically for the right to clear and develop forest lands. Thus, the "wetlands" definition does not answer a scientific need, it satisfies a practical, a social, a political need, the need to define the scope of Section 404 jurisdiction. It should be interpreted with this purpose in mind. The definition may be scientifically incorrect, but that should not affect its validity as a jurisdictional definition. A "wetlands" is what Congress (as reflected by the regulations) says it is. We have the definition. We have been favored by the testimony and evidence of imminent agronomists, soil scientists, hydrologists and biologists. This information has been used by us to classify the types of soil and vegetation and to determine the topography and hydrology affecting the Lake Long tract and to determine whether the wetlands characteristics, the elements of the definition, are present. If the elements of the definition are not present then the Lake Long tract is not a wetland.

## D. MERITS

"Wetlands" are included in "waters of the United States" and were called "fresh

12. *Natural Resources Defense Council, Inc. v. Callaway, supra:*

"(1) 1. Congress by defining the term 'navigable waters' in Section 502(7) of the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 33 U.S.C. § 1251 *et seq.* (the 'Water Act') to mean 'the waters of the United States, including the territorial seas,' asserted federal jurisdiction over the nation's waters to the maximum extent permissible under the Commerce Clause of the Constitution. Accordingly, as used in the Water Act, the term is not limited to the traditional tests of navigability.

"(2) 2. Defendants Howard H. Callaway, Secretary of the Army, and Lt. Gen. William C. Gribble, Chief, Army Corps of Engineers, are without authority to amend or change the statutory definition of navigable waters and they are hereby declared to have acted unlawfully and in derogation of their responsibilities under Section 404 of the Water Act by the adoption of the definition of navigability described at 33 C.F.R. § 209–210(d)(1), 39 Fed.Reg. 12119 (April 3, 1974), and 33 C.F.R. § 209.260."

water wetlands in the July 25, 1975 regulation:

> "(8) Freshwater wetlands, including marshes, shallows, swamps, and similar areas that are contiguous or adjacent to other navigable waters and that support freshwater vegetation. 'Freshwater wetlands' means those areas that normally are characterized by the prevalence of vegetation that *requires* saturated soil conditions for growth and reproduction." (emphasis ours).

The revision in the July 19, 1977 regulation refers to "wetlands" and affirms them, 33 C.F.R. 323.2(c), as follows:

> "(c) The term 'wetlands' means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of *vegetation typically adapted* for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." (emphasis ours).

There is no dispute that wetlands are transition areas lying between the aquatic and the terrestrial zone. Necessarily wetlands are at times wet and at other times dry. By their nature they are subject to periodic pulses of water. Were they always wet they would constitute part of the aquatic zone. Likewise, were they always dry they would constitute part of the terrestrial zone. How wet and how often they are wet (in order to qualify as wetlands) is determined by the land's capacity under normal circumstances to support "a prevalence of vegetation typically adapted for life in saturated soil conditions." There are three areas of analysis to determine whether a tract of land is or is not a wetland under the 1977 definition: The type of soils, the degree and frequency of inundation and saturation, and the type of vegetation. We have made findings of fact on each of these elements sufficient to form a basis for our legal conclusion.

In order to determine whether a particular area is or is not a wetland, both the 1975 and the 1977 definitions utilize the charac-

teristics of the hydrology, the soils, and the vegetation. The 1977 definition is broader in several respects. The purpose of the revision, as we shall see, was to broaden jurisdiction and to eliminate problems of interpretation arising from the final interim definition of 1975.

The most important revision is the elimination of the words "vegetation that *requires* saturated soil conditions" appearing in the 1975 definition by the words "vegetation *typically adapted* for life in saturated soil conditions". No one can deny that the "wetlands" concept is broadened by the revision. The private defendants contend that wetlands should be restricted to the deep swamp or cypress swamp areas in which only Bald Cypress, Button Bush, Black Willow, Tupelo Gum, Swamp Privet and Water Elm can survive. All the experts agreed that these species are the most tolerant of the vegetable species and can survive in soils which are inundated or saturated almost 100% of the time. There is no doubt that the 1975 definition included this species at the very least. The effect of this theory is to reduce the area of "wetlands", and consequently the jurisdictional reach of § 404, to the ultimate. It would be reduced to the smallest area possible. It implies that "wetlands" as used in the CWA is a scientific term, that it is immutable and that it must be interpreted with no consideration for the goals and purposes of the Act. As a matter of fact, it represents the same trend of thought, the same theory, the same interests which have been rejected previously in the litigation, in the contest involved in the 1976 amendments, in the revision of 1977 and in the passage of the CWA in December 1977 without disturbing the final revision. We find absolutely no basis for the contention that the words "for life" means that "wetlands" vegetation must spend all of its life in inundated or saturated soils. We hold that the word means simply the ability to live, to exist, to tolerate. Only the latter interpretation is consistent with the balance of the clause in which "for life" appears; with the rest of the definition and with the purpose of the

1977 revision. If the meaning of "wetlands" is to be restricted in this manner, there was no need to revise in 1977. We agree with plaintiffs [13] that the words "vegetation typically adapted for life in saturated soil conditions" includes all vegetation which is capable of and does adapt regardless of a mechanism it might employ to do so. The scientific evidence establishes that there is little or no dispute regarding which vegetable species are intolerant. The only discernable disputes occurred in the degree of tolerance assigned to each tolerant species by different scientific experts. These disputes are more a matter of semantics than actual differences of opinion because the definitional standards for the classifications VT, T, and ST differed. However they all had a common characteristic—they were all tolerant to a greater or lesser degree. None were intolerant. We hold that all species except the intolerant species are wetland species. We hold in fact that the very purpose of the revision was to close a technical loophole which might exclude many species which are truly aquatic by adaption but do not *require* saturated soil from a biological standpoint for their growth and reproduction. Certainly this broader interpretation was the intent of the drafters of the 1977 revision.

"At the same time, we have changed our description of the vegetation involved by focusing on vegetation 'typically adapted for life in saturated soil conditions.' The old definition of 'freshwater wetlands' provided a technical 'loophole' by describing the vegetation as that which requires saturated soil conditions for growth and reproduction, *thereby excluding many forms of truly aquatic vegetation that are prevalent in an inundated or saturated area, but that do not require saturated soil from a biological standpoint for their growth and reproduction."* Fed.Reg., Vol. 42, No. 138, at p. 37128 (1977). (emphasis ours).

This broad interpretation is supported in revisions of other parts of the definition. The words "those areas that are periodically inundated" in the 1975 definition are replaced by the words "Those areas that are inundated or saturated by surface or brown water at a frequency and duration sufficient to support" certain vegetation. Both of these definitions emphasize the intermittent or temporary duration of the inundation. The revision makes it clear that inundation is not necessary if the actual saturation is present. Defendants have contended that wetlands are restricted to deep swamp or cypress swamp areas. We find however that the defendants' interpretation is strained and inappropriate in the context of the definition and completely in conflict with the first sentence in the revision which is quoted above. We find also that it is refuted by the Corps' explanation of the revised language.

"The reference to 'periodic inundation' has been eliminated. Many interpreted that term as requiring inundation over a record period of years. Our intent under Section 404 is to regulate discharges of dredged or fill material into the aquatic system as it exists, and not as it may have existed over a record period of time. The new definition is designed to achieve this intent. It pertains to an existing wetland and requires that the area be

---

13. "Stress borne by the rooting zone of plants in saturated soil conditions is less severe than the stress borne by rooting zones covered by standing water because the pathway for diffusion of oxygen through the stem to the root zone which facilitates aerobic respiration is significantly shorter in plants that grow in saturated soil conditions than in plants whose stems are partially submerged (Teskey, Hook). Thus, many bottomland hardwood species, including all of the tolerant species, as well as the three intermediately tolerant species found on the tract (bitter pecan, sugarberry (*Cletis laevigata*) and honey locust), as identified in Teskey/Hinckley Vol. II (Pls. 15, pp. 18–19), have the adaptations required to grow and survive in soils saturated for significant portions of the growing season (Teskey, Radford, Kral). However, these same species may not be able to tolerate nearly permanent inundation or standing water in deep swamp conditions. Since 33 CFR § 323.2(c) speaks of the ability to live in saturated soil rather than inundated conditions, areas dominated by species which can grow in saturated soils, but may not be able to survive in deep standing water subject to prolonged, regular flooding, should not be excluded from being considered as wetlands."

inundated or saturated by water at a frequency and duration sufficient to support aquatic vegetation. This inundation or saturation may be caused by either surface water, ground water, or a combination of both." Fed.Reg. Vo. 42, No. 138, p. 37128 (1977).

The 1977 revision retains the expression "prevalence of vegetation" which was used in the 1975 revision. We interpret the term to mean the dominance of tolerant or aquatic species to the virtual exclusion of purely upland, intolerant or nonaquatic species. If a substantial growth of intolerant species is present, the prevalence of tolerant species is destroyed. The explanatory comment of the Corps sustains this interpretation:

"Concerns were also expressed over the types and amount of vegetation that would be required to establish a 'wetland' under this definition. We have again used the term 'prevalance' to distinguish from those areas that have only occasional aquatic vegetation interspersed with upland or dry land vegetation." Fed. Reg., Vol. 42, No. 138, at p. 37128 (1977).

## E. CONCLUSION

■ We find that the definition was revised in 1977 to assure that wetlands was sufficiently broad in concept to give jurisdiction required for achieving the goals of the CWA. We also find that the Lake Long tract is not inundated or saturated to a wetlands standard from about June 15th to July 1st to December 1st of each year but that from the 1st of December to approximately June 15th it is inundated or saturated intermittently and at different durations but to a sufficient frequency and duration to support vegetation as described in the definition. We find in addition that the plant species mentioned above (Finding of Fact No. 8) are capable of adapting to the inundated and saturated condition existing on the Lake Long tract, that they are found in prevalence on said tract to the

virtual exclusion of any upland species and that these species have adapted, that is, they grow and reproduce normally and without artificial aids or cultivation throughout the Lake Long tract. The scientific evidence goes into much detail regarding the anaerobic condition of soils in an inundated or saturated condition; how certain species such as Bald Cypress tolerate and adapt by oxidizing the rhizosphere; how others adapt by certain adaptations or other adapting mechanisms. Much of the briefing by the parties involved a detailed discussion of the different methods of adapting. We fail to find any basis in the definition for these scientific distinctions. We hold the scientific evidence shows without substantial disagreement that all of the plant species which appear in prevalence on the Lake Long tract (Finding of Fact No. 8) are tolerant species. The only difference between experts is the degree of tolerance in specific species. Significantly none are found to be intolerant. Thus where these species appear in prevalence as they do here in a wetland environment of soils and hydrology the elements of the wetland definition are present. The Lake Long tract is therefore wetlands.

The sole exception to the above findings is related to the areas covered by Roxanna and Norwood soils and this finding is based on the lack of evidence of wetland characteristics in the soil. Perhaps such evidence is available but it is not in this record. We therefore find that the record is deficient of evidence to show the wetland nature of Roxanna and Norwood soils which lie in the Lake Long tract along the bank of the Red River and along the Lake Long ridge. We also find that the said soils along the Lake Long ridge from the northernmost point of Pointe Basse to the intersection with Bayou Natchitoches are so thin that they lack separate identity and must take their identity from the wetlands around them and be subject to regulation under § 404. (See Exhibit 1 attached).[14]

14. Exhibit 1 is a reduced facsimile of an overlay (Court Exhibit # 1) of the plat attached to the Government's final determination of March 26, 1979. The outline of the non-wetlands

shown thereon are the outer limits of the (61) Roxanna and (52) Norwood soils as shown on soils map (Gov.Ex.G) rounded off so as to eliminate sharp irregular indentations and pockets.

We approve the Government's final wetland determination filed in these proceedings on March 26, 1979 except those portions of the *Application of Methodology* and *Other Major Points Considered* which conflict with our finding restricting non-wetland areas to the Red River bank and the portion of the Lake Long ridge as above set forth on Exhibit 1 attached.

We grant a permanent injunction as prayed for enjoining any additional clearing, except by permit under Sec. 404, 33 U.S.C. § 1344, of the wetlands in the Lake Long Tract as determined by this opinion with the exception of those wetlands cleared prior to the issuance of our temporary restraining order of November 7, 1978.

We repeat and reaffirm our findings in *Avoyelles Sportsmen's League v. Alexander, supra,* regarding the cleared lands above referred to.

EXHIBIT I

LEGEND

UNITED STATES COURT'S
DETERMINATION OF WETLANDS
IN THE LAKE LONG TRACT, LA.

404 WETLANDS

NONWETLANDS

SCALE
1 INCH = APPROXIMATELY 1/2 MILE

LEGEND

UNITED STATES GOVERNMENT
DETERMINATION OF WETLANDS
IN THE LAKE LONG TRACT, LA.

404 WETLANDS

NONWETLANDS