UNITED STATES of America

v.

Edward Lunn TULL.

Civ. A. No. 81–688–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 28, 1983.

Diane L. Donley, U.S. Dept. of Justice, Environmental Defense Section, Washington, D.C., John F. Kane, Asst. U.S. Atty., Norfolk, Va., for plaintiff.

Richard A. Nageotte, Woodbridge, Va., for defendant.

## OPINION AND ORDER

DOUMAR, District Judge.

This matter came on for a trial by the Court sitting without a jury.

The government filed its original complaint on July 1, 1981. On April 2, 1982, the government amended its complaint. During the course of the trial, the government sought leave to amend its complaint again. Leave was granted, and on October 5, 1982, the government's second amended complaint was filed.

In claim (1) of the second amended complaint, the government charged that between July 1975 and the present, the defendant, without benefit of a permit issued by the United States Army Corps of Engineers, discharged pollutants, namely fill material, into wetlands adjacent to navigable waterways known as Fowling Gut and Black Point Drain. These alleged wetlands were located on properties collectively referred to as Ocean Breeze Subdivisions and

specifically referred to as Ocean Breeze Mobile Home Sites, Ocean Breeze Mobile Home Sites Section B and then Section C. (Section C is shown on the plat of Section B and the three Sections are shown on Exhibits 55A and 55B).

Similar allegations were set forth by the government in claim (2) of its most recent amended complaint. Claim (2) states that sometime between September 28, 1977 and November 14, 1980, the defendant, again without benefit of a permit, discharged fill material into wetlands located on the Mire Pond Camper Sites I and II. The wetlands referred to in claim (2) were likewise alleged to be adjacent to Fowling Gut.

In claim (3) of the amended complaint, the government alleges that the defendant discharged pollutants into wetlands adjacent to Eel Creek, another navigable waterway for the island of Chincoteague. Once again, it is alleged that the defendant failed to apply for a permit prior to placing fill material on the described wetlands.

The government asserts that in filling of the wetlands without a permit the defendant has violated the requirements of the Clean Water Act. 33 U.S.C. §§ 1311, 1344 and 1362(7). Relief is sought pursuant to 33 U.S.C. § 1319.

In its second amended complaint, the government further charges that the defendant filled a navigable waterway of the United States, namely an extension of Fowling Gut, which at one time traversed through Ocean Breeze Mobile Home Sites. The government claims that this extension of Fowling Gut was filled, blocked and closed by the defendant without the authorization of the Secretary of the Army and recommendation of the Chief of Engineers. Relief is sought pursuant to 33 U.S.C. §§ 406; 1319.

The defendant has denied liability on all counts. Additionally, the defendant has raised several affirmative defenses which will be hereinafter discussed in detail.

A lengthy trial before the Court thus ensued. Based upon the factual findings and legal conclusions embodied within this

opinion, judgment will be entered for the United States of America.

## I.

A long time inhabitant of Chincoteague, defendant Tull is actively engaged in the business of filling and developing residential resort properties on the island. In this action, the Court shall only concern itself with Mr. Tull's alleged activities on the properties commonly known as Ocean Breeze Mobile Home Sites, Ocean Breeze Mobile Home Sites Section B, Ocean Breeze Mobile Home Sites Section C, (all of which comprise the Ocean Breeze Subdivision), Mire Pond I, Mire Pond II (both of which comprise Mire Pond), Eel Creek (not yet subdivided into lots) and a body of water hereinafter sometimes referred to as "Fowling Gut extended".[1] A brief general description of these properties will provide the backdrop for the analysis of Mr. Tull's alleged activities thereon.

The Ocean Breeze Mobile Home Sites are located on the Southwestern portion of Chincoteague Island, Virginia. They lie southeast of Chincoteague Channel and northwest of Black Point Drain and Assateague Channel. (See Exhibit 10). Portions of Ocean Breeze Mobile Home Sites abut Fowling Gut and lie atop what is Fowling Gut Extended, a winding navigable waterway which feeds into Chincoteague Channel to the west and into Andrews Landing Gut to the south. On Exhibit 10 Ocean Breeze Mobile Home Sites is circled and lies approximately at the letter "g" of the word "Fowling" and proceeds northeasterly atop said waterway approximately 1000 feet.

An extension of Ridge Road, Virginia State Route 2102, traverses Ocean Breeze Mobile Home Sites in a southwesterly direction. Initially Ridge Road only extended into the property immediately adjacent to and east of what is now the subdivision

of Ocean Breeze Mobile Home Sites and was the only public road which served the subdivision. A service road built and maintained by the defendant Tull, now bounds the Ocean Breeze subdivision to the south, and is referred to on one plat as "Bunker Hill Campground Road"[2], which road was filled in by Mr. Tull. As is shown on a registered survey plat (Ex. 55A) prepared by Mr. Ralph Beebee, the following lots are situated and have been developed to the northwest of Ridge Road and to the south of what is left of a portion of Fowling Gut (and a 50 foot wide reserved right of way which runs through the top or northeastern portion of the subdivision): Lots 23–70, 120–121; Drain Field Lots 23–38, 39–54, 54–70; and several lots denominated as Future Drain Field Lots. To the southeast of Ridge Road the following Ocean Breeze Mobile Home Sites lots are shown on the survey plat: Lots 1–22, 71–119 and six lots denominated as Future Drainfield sites.

Ocean Breeze Mobile Home Sites and Ocean Breeze Mobile Home Sites Section B (Ex. 55B) are separated by a lane approximately 22 feet wide which is designated on the defendant's subdivision plats as "Drainage Easement." In actuality, a very narrow ditch approximately two feet wide is located within this area. The following lots comprise Ocean Breeze Mobile Home Sites Section B: Lots 1B–78B, inclusive. Ocean Breeze Mobile Home Sites Section C borders Ocean Breeze Mobile Home Sites Section B to the northeast. At present Ocean Breeze Mobile Home Sites Section C is composed of four 50 foot by 100 foot lots; 8C, 9C, 10C and 11C and one 80 foot by 100 foot lot; 7C is shown on the same plat as Ocean Breeze Section B.

Sea Shore Drive bounds those numbered lots developed on Ocean Breeze Mobile Home Sites Section B to the southeast. Between Sea Shore Drive and Bunker Hill Campground Road lie three unnumbered lots which are designated as drainfield lots.

---

[1] This has been referred to as a "canal" or waterway but is distinguished from "The Canal" shown in Exhibit 10 which is the main channel from Chincoteague Channel to Assateague Channel (See Exhibit 10).

[2] Bunker Hill Campground is another development of Mr. Tull not at issue in this lawsuit.

To the west of the subdivision of Ocean Breeze Mobile Home Sites B was an undeveloped area which, at the time of the Court's September 1982 view of the property, gave the appearance of a swamp or a bog.

With the exception of a few drainfield lots, the majority of lots in Ocean Breeze Mobile Home Sites measure 50 feet by 100 feet. In Ocean Breeze Mobile Home Sites Section B, most lots likewise measure 50 feet by 100 feet. Some of the lots adjoining Sea Shore Drive in Ocean Breeze Mobile Home Sites are irregular in shape and are slightly larger than the standard 50 foot by 100 foot lot dimensions.

Ingress and egress within the Ocean Breeze Subdivisions are provided through Sea Breeze Drive, Sea Gull Drive, Sea Shell Drive, Sea Spray Drive and Sea Horse Drive, roadways which run in a northwesterly direction and generally perpendicular thereto are Ridge Road Extended and Sea Shore Drive, all of which were developed by defendant Tull from 1975 onward. Approximately 150 feet to the south of and parallel to Sea Shore Drive is Bunker Hill Campground Road.

The defendant claims to have owned all the lots in Ocean Breeze Subdivisions. At various intervals, beginning in 1975, and continuing until the present, the defendant either leased or sold these lots in Ocean Breeze to third parties, many of whom have placed mobile homes on their parcels. Defendant Tull is currently involved in a separate lawsuit with regard to the title to some of the area in the Ocean Breeze subdivision, but for this Court's purposes, that litigation is not material to this lawsuit. As of the date of trial, Lots 4, 14, 19, 64, 65, 66, 67, 68, 69, 70, 74, 76, 96, 97, and 106 were still owned by the defendant. Currently, the defendant also owns lots 7C, 8C, 9C, 10C, 11C, 11B and the drainfield lots. The defendant realized approximately $5,000 net profit per lot for the sales of the lots in Ocean Breeze Mobile Home Sites.

Mire Pond I and Mire Pond II Camper Sites are located a few miles northeast of the Ocean Breeze Mobile Home Sites. The Mire Pond properties also lie east of Chincoteague Channel. Fowling Gut borders the Mire Pond properties to the west. Virginia State Route 2102 abuts Mire Ponds I and II to the east. (See Ex. 116 which shows both sections).

Mire Pond I consists of twenty-nine smaller sized and sometimes irregularly shaped lots, suitable for the placement of camper trailers. At no time material to this action did the defendant own the lots in Mire Pond I. Although the present owners of the lots in Mire Pond I purchased their properties directly from the defendant's parents, who were the then title holders to those properties, the defendant played the instrumental and paramount role in the development and sale of the lots located in Mire Pond I and otherwise dealt with them as his own.

Mire Pond II adjoins Mire Pond I to the northeast. It is composed of twenty-five lots. At one point, the defendant owned all the land comprising Mire Pond II. Lots 1(a), 6(a), 7(a), 8(a), 9(a), 10(a), 11(a), 12(a), 13(a), 14(a), 15(a), 16(a), 19(a), 20(a), 21(a), 22(a), and 25(a) are presently owned by the defendant. A preliminary injunction issued by this Court at an earlier date, which currently remains in full force and effect, prohibits the defendant from conducting any filling activities whatsoever on Mire Pond II. The defendant and those for whom he acted recognized approximately $5,000 net profit per lot for the sale of lots in Mire Pond I, as well as Mire Pond II.

The third property involved in this lawsuit, Eel Creek, lies west of Assateague Channel and Piney Island and flows into Little Oyster Bay. Chicken City Road is to the west of the Eel Creek property, with the Eel Creek waterway itself, abutting the land to the east. The Highland Park Development projects bounds the subject property to the northwest and the Donald Birch property to the southeast. On Exhibit 58 the property identified as "Edward L. Tull" has been split by a road owned by Tull which runs down the middle thereof from Chicken City Road to Eel Creek. The northeastern side of the road is still owned

by Tull, a portion of which is in contention in this litigation. The southwestern side of the road is owned by Donald Birch. Although the Donald Birch land was filled by Tull, it is not in contest herein nor has the United States made the new road a part of this litigation.

The defendant owned the described property at Eel Creek. At trial, he testified that at present there exists pending contracts for the sale of certain parcels. The defendant has traded with Donald Birch one-half of his Eel Creek property which is further upstream from Little Oyster Bay. Others (specifically including William M. Birch and the government—highway department) have also obtained rights along Eel Creek which are further upstream.

Asserting a special grant from the sovereign, the defendant also claims ownership to the bottom of Eel Creek itself. The evidence, however, failed to show an unbroken chain of title spanning from an original special grant of Eel Creek by the sovereign to the defendant. Nonetheless, even though the defendant may have acquired rights to the other side of Eel Creek, he could not extinguish the public's rights to the waterway, nor those of others who are upstream. Nor can he extinguish the rights of the United States to its navigable servitude.

The defendant now owns or at one time owned three dump trucks, a front-end loader and a tractor equipped with a grading blade. Additionally, the defendant owns and maintains a borrow pit from which vast amounts of fill material were taken and hauled to the subject properties.

On July 21, 1976, several members of the Norfolk District Army Corps of Engineers visited the defendant's properties on the island of Chincoteague in order to determine the "Corps' jurisdiction" as to any filling activity to be conducted thereon. Although the Chief of the permitting section was not present at this meeting, his immediate subordinate, one Caruthers, was present. For most of the inspection, the defendant was also present.

After briefly viewing a site not at issue in this litigation, the group proceeded to the Ocean Breeze Mobile Home Sites. They approached Ocean Breeze Mobile Home Sites from the Northwest corner (Lots 1–2; 23–30) of the property and proceeded toward Fowling Gut. Caruthers noticed what he believed were wetlands adjacent to a filled area in the Northwest corner and advised the defendant that he would need a permit to fill that area. Thereafter, Caruthers walked in a southerly direction across the filled area. The defendant remained in the northwest corner of Ocean Breeze Mobile Home Sites. No further conversation was had between members of the Corps and the defendant. The defendant at no time inquired of anyone as to whether he would be allowed to fill in the southern or western portions of Ocean Breeze Mobile Home Sites without first obtaining a permit. Nor has the defendant acquired nor ever applied for a permit.

The group then viewed the Eel Creek Site. Apparently no conversation was had between the members of the Corps and the defendant during the group's visit to the Eel Creek property. Prior to this visit, however, a formal notice was sent by the Corps to the defendant on March 3, 1976, ordering the defendant to "cease and desist all further filling in Eel Creek or its wetlands until such time as you [the defendant] have obtained Department of the Army permit." On August 25, 1976, a follow-up letter from Colonel Newman Howard indicated that the cease and desist order would remain in effect, that decision having been confirmed by the July 21, 1976 visit to the Eel Creek site.

From 1978 through 1982, James and Donald Ballard worked almost exclusively for the defendant. Apart from some minor repair work and grass cutting duties, the Ballards devoted virtually all their time to the operation, service and maintenance of the defendant's hauling, loading and grading equipment. They were hired to haul sand to Ocean Breeze Mobile Home Sites.

Another independent hauler, one Alexander J. Justice, also hauled sand to the Ocean Breeze Mobile Home Sites for the defendant. Justice was paid for at least thirty-four days of hauling.

An aerial photograph of the Ocean Breeze Mobile Home Sites area shows the lots west of Ridge Road (Lots 23–70) were undeveloped as of November, 1975. This photograph shows filling on Lots 1–22 and Lots 93–104. There was, however, no filling on what are now Lots 71–92 and/or Lots 115–119.

The defendant testified that he filled Ocean Breeze Mobile Home Sites Lots 1–22 in 1974–75, filled Lots 104–114 in 1975–76, filled Lots 93–103 in 1975–76, and that filling on Lots 82–92 commenced sometime during 1976–77 and continued through 1979. Filling on Ocean Breeze Mobile Home Sites Section B began in 1976 and continued through 1979. Filling on Ocean Breeze Mobile Home Sites Section C occurred in 1979–80. A revision to the defendant's 1975 survey plat (Ex. 55–A) indicates that Lots 120–121 were developed sometime between 1978 and 1979. According to the defendant, the only filling which occurred during 1982 was the filling of some drainfield lots. The government does not seek relief for any filling activity on Lots 1–22 as that was likely completed prior to July 25, 1975. *See* 33 C.F.R. § 323.3(a)(1).

An estimated 20,000 cubic yards of sand were used to fill the Ocean Breeze Mobile Home Sites. Filling activity by the defendant on the Ocean Breeze Mobile Home Sites occurred on at least one hundred separate days. At no time did the defendant apply for, nor did the United States Army Corps of Engineers issue to him, a permit for filling of the Ocean Breeze Mobile Home Sites.

Similarly, Donald and James Ballard, under the direction of the defendant, hauled sand to fill the Mire Pond Camper Sites. The defendant admitted filling Mire Pond I on behalf of his father, but insists that he remained ten or twelve feet back from a self-imposed restricted area. He professed not to have knowledge as to the identity of the individual or individuals who filled this restricted area. The defendant did, however, state that he aided one lot owner in the construction of a bulkhead. On those lots abutting Fowling Gut (Lots 22, 23, 24, 25, 26), he estimates the fill he placed there to be approximately three feet deep.

Recent photographic slides taken of this area indicate that the majority of the filling on Mire Pond II has occurred since February 1982. As of May 5, 1982, fill material had been placed on those Mire Pond II lots abutting a fence which separates Mire Pond II from Mire Pond I. Thus, it would appear that at least portions of lots 4A, 5A, 6A, 7A, 8A and 9A had some fill material.

Donald and James Ballard also were employed by and directed by the defendant to discharge fill material, namely sand and oyster shells, on the Eel·Creek property at various intervals from approximately the year 1977 until and including the duration of this action. Filling on the Eel Creek site was achieved principally by means of bulldozing and grading of a hill located on the upper-portions of this property. The defendant owned the grading equipment used by the Ballards in the filling of the Eel Creek Site. Akin to his actions vis-a-vis the Ocean Breeze Sites and the Mire Pond Sites, the defendant did not apply for a permit prior to engaging in any filling activity on the Eel Creek property.

The government introduced substantial credible evidence to show that the fill material placed by the defendant on portions of these properties was placed on land which was typically tidal, marsh or bog in character. Soil analyses were performed by the government's experts upon various samples taken from portions of some of these properties to determine the composition of the vegetation lying beneath the fill material.

Government field scientists extracted soil samples from a site located on Lot 121 on Ocean Breeze Mobile Home Sites and from a point on property situated between Lot 120 and Fowling Gut. A subsequent analysis of these samples showed that peat lies

beneath the fill material. Peat is wetland plant material with a high water content which causes anerobic soil conditions and which is usually found near the surface. This sample also revealed an abundance of spartina alterniflora, an obligate wetlands species. In combination, peat and spartina alterniflora strongly indicate the existence of a wetland type environment.

Similar analyses were performed upon random soil samples taken from sites on Lots 39(b), 59(B) and 72(B) in Ocean Breeze Mobile Home Sites Section B. The sample taken from Lot 39(B) showed a predominance of peat and spartina patens, a facultative plant species which may appear in wetlands or uplands. The analyses performed upon the soil samples taken from Lots 59(B) and 72(B) showed peat and distichlis spicata. Distichlis spicata is generally recognized as an obligate wetland species.

Samples taken from a site on Lot 9(C) likewise showed all peat. Although the vegetation was not distinguishable, a few loblolly pine needles were found in the sample. Loblolly pines usually are found on the ridges of wetlands and their branches and needles frequently project over wetland areas.

Core samples from property immediately adjacent to Ocean Breeze Mobile Home Sites were also examined. From four sites on property adjoining the northeasternmost section of Ocean Breeze Mobile Home Sites, the government's field scientists discovered peat, mixed with a small amount of sand, and distichlis spicata. A sample was likewise taken from property immediately adjoining Ocean Breeze Mobile Home Sites to the south. This sample revealed peat and spartina alterniflora, an obligate wetland species. A sample taken from property lying further south showed an abundance of sand, from which the remnant plant parts could not be identified.

Because the topographic evidence tended to show that a ridge and swale system had formed in portions of Ocean Breeze Section B and the property adjoining it to the northeast, the Court engaged the services of an independent expert witness, Professor Donna M.E. Ware, to determine the speciation of the flora found within this apparent ridge and swale system. Accompanied by the Court and counsel for all parties, Dr. Ware visited this section of the island and examined the vegetation. She opined that the species of saltmarsh grasses (spartina patens, distichlis spicata and spartina alterniflora) and the iva frutescence she observed on the dune swales in this system had developed under "a regime of tidal connection with saltmarshes" on the southwest sector of Ocean Breeze Mobile Home Sites Section B. Dr. Ware further was of the opinion that these swales supported other species which are known to exist in both brackish and fresh water conditions. Dr. Ware believed that, with the sole exception of polygonum punctatum (dotted smartweed), these facultative species also developed due to a tidal connection with those marsh grass species lying to the southwest of Ocean Breeze. It was Dr. Ware's opinion that the polygonum punctatum probably invaded the saltmeadow habitat when the system became less saline subsequent to the curtailment of the described tidal connection.

Other evidence tended to show that the soil taken from these sample sites was saturated and was subject to tidal inundation. Dr. John Clay, a soil scientist, also examined the composition of the soil taken from lots near the southern end of Route 2102 in order to ascertain the soil's color, wetness and texture. Dr. Clay opined that the soil he examined reflected a high phase tidal marsh, which was subject to flooding by tidal action. Likewise, Mr. Sumner, an Environmental Scientist for the Environmental Protection Agency, stated that the soil at the sample sites was in a saturated condition. Indeed, the Court itself observed saturated and marsh type soil conditions on the western portions of the Ocean Breeze Mobile Home Sites during the Court's September 20, 1982 view of that property.

Two major sources provide the tidal waters which flow into Ocean Breeze Mobile Home Sites and Ocean Breeze Mobile

Home Sites Section B. One system originates from Assateague Channel, while the other system originates from Fowling Gut, each of which is a navigable waterway. The ridge and swale system which comprises a great percentage of Ocean Breeze Mobile Home Sites Section B is apparently (or was prior to filling) interconnected by means of marshes and small streams, flowing to Black Point Drain and Assateague Channel.

The area now encompassed by the Ocean Breeze Subdivision is shown on geological survey maps published by the Department of the Interior of the United States for civilian use. These maps show a substantial portion of Chincoteague Island. Plaintiff's Exhibit 135A, is a map dated "1943" and contains a stamp date of December 12, 1962 stamped thereon; plaintiff's Exhibit 10, is dated 1965 and was "photoinspected 1973"; on the rear side of Exhibit 10 and attached thereto is a map dated 1965; and Ex. 134A is the 1965 map photoinspected as of 1979. Exhibit 10 shows that Fowling Gut (as labeled on that plat) is beneath what is now Ocean Breeze Mobile Home Sites. Fowling Gut continued on to Andrews Landing Gut and thereafter into Assateague Channel. The 1943 map shows the entire area of what is now the Ocean Breeze Subdivisions as swamp. The 1973 photoinspected map shows that the Ocean Breeze Subdivisions include both swamp and water filled land together with some dry land.

There is no question that the Ocean Breeze subdivisions (including Sections B and C) contained substantial swamps, waterways and ponds prior to the defendant's acquisition and filling. A mere glance at Exhibit 134A, the photoinspected 1979 official map, shows that Sections B and C of Ocean Breeze lie between what is shown on that official map as "Trailer Park" and the non-labeled record as being mostly ponds and water connected to tidal areas. This area of ponds and swamp was filled and later became Sections B and C of Ocean Breeze. The defendant contends that these ponds and the water therein was fresh water and non-tidal. The Court finds that it was tidal water and that the only reason that any portion may have become something other than tidal water (i.e., fresh water) was due directly to and as a proximate result of the defendant's filling activities thereon. The Court specifically declines to lend credence to those witnesses for the defendant who testified contrary to this finding.

The Court finds that the defendant filled in wetlands on the tidal and navigable waters of the United States located on the following lots in Ocean Breeze Mobile Home Sites: 120, 121, 39B, 59B, 62B, 71B and 72B, all of which were either under water at the time of the Court's view or were shown by core samples to have been wetlands.

Lots 7C, 8C, 9C, 10C and 11C in Ocean Breeze Mobile Home Sites are or were wetlands on the waters of the United States. Any fill located on these said lots designated with a C shall be removed and restored by the defendant in accordance with the directions of the Army Corps of Engineers.

The Court further finds that part or portions of the following streets were at one time wetlands of the navigable waters of the United States filled by the defendant without a permit: Sea Breeze Drive, Sea Gull Drive, Sea Shell Drive, Sea Spray Drive, Sea Horse Drive, Sea Shore Drive and Ridge Road.[3]

The Court finds that more than one day each of filling activity by the defendant occurred with regard to each and every lot and each and every street above-mentioned as having wetlands thereon which were filled by the defendant, as well as a minimum of one day for each and every street above named.

At Mire Pond I, soil analyses were performed on samples taken from Sites on Lots 25 and 29. In the sample taken from

---

**3.** In addition, the Court finds that several of the lots designated "Drainfields for Lots" were wetlands in 1977.

Lot 25, peat and spartina alterniflora were found. An examination of the sample extracted from Lot 29 revealed the presence of peat, a substantial amount of distichlis spicata and a random incidence of spartina patens, all of which are found in wetlands.

In examining the aerial photographs and considering all of the evidence, substantial portions of Lots 22, 23, 24, 25 and 26 were wetlands subject to tidal action in September, 1977, and were part of the "waters of the United States."

A field survey of the surface vegetation was made by the government's field scientists on December 14, 1981 in Mire Pond II.[4] The government's field survey disclosed the existence of spartina alterniflora on what appears to be Lots 13A and 22A. Reeds (a facultative plant) and spartina patens has been growing on portions of Lots 8A, 9A and 10A. Spartina patens, distichlis spicata and iva frutescence were observed on portions of Lots 4A, 5A, 6A and 7A. The Court itself walked upon this land in September of 1982 and portions of Lots 8A, 9A, 10A, 11A, 12A, 22A and 13A were under water. Lot 8A had contained some fill material. The Court finds that Lots 8A, 9A, 10A, 11A, 12A, 22A and 13A are wetlands and within the waters of the United States and are tidal waters.

During its view of the Mire Pond Camp Sites, the Court observed crab pots lying at the bottom of Mire Pond itself. The water was approximately five or six feet deep and flowed into Fowling Gut which likewise appeared to be four to six feet deep. It is this same Fowling Gut which once flowed through what is now Ocean Breeze into Assateague Channel, which now only flows into Chincoteague Channel from Mire Pond. At the time the Court viewed the premises, there was approximately 9 inches of standing water on Lot 8A, and that lot was undoubtedly a swamp.

The Court finds that the marsh-type environment located at Mire Pond II was essential for the sustenance of the marine ecosystem in that area.

The Court further finds that this wetlands marsh (inundated by tidal water) which existed in Mire Pond II at the time of the view likewise existed in Mire Pond I prior to the filling therein by the defendant. The testing, the natural contour of the land and the plant material found in Mire Pond I and II indicate that Lots 22, 23, 24, 25, 26 and 29 of Mire Pond I are or were partially or completely filled wetlands, having been filled by or at the direction of the defendant. Five of these lots abutted Fowling Gut (at this point called Mire Pond) itself, were subject to tidal inundation and were thus part of the waters of the United States. The Court finds that the defendant was responsible for the fill material deposited on the above-enumerated lots. The Court further finds that the defendant filled Lots 8A, 22, 23, 24, 25, 26 and 29 of Mire Pond I and Mire Pond II without first applying for the necessary permits from the United States Army Corps of Engineers as these lots were part of the waters of the United States. The Court finds at least one day of filling occurred at the plaintiff's direction for each of the above-enumerated lots or a minimum of seven separate days of filling on said six lots in Mire Pond I, and at least four separate days of filling in Mire Pond II wetlands.

On the defendant's property at Eel Creek, there was shown the presence of peat, spartina alterniflora and spartina patens, all wetland species. Eel Creek is a navigable waterway and is tidal in nature flowing into Little Oyster Bay which flows into Assateague Channel. In visiting the Eel Creek property on September 20, 1982, the Court observed marsh covering all but the northernmost 15 feet of the adjacent Lot 14 in the Highland Park Development. The topography of the land would indicate that the adjacent property followed the natural contour as shown in the hatched area on Exhibit 6A. At the time that the view was made, the adjacent Highland Park Lot 14 was under water, except for the northernmost 15 feet thereof.

---

**4.** See Exhibit 78.

Akin to Mire Pond, the marsh located at Eel Creek furnishes necessary nutrients to the fish and other marine inhabitants of Eel Creek.

The evidence showed that approximately 6,000 square feet of land had been filled, not including the proposed road built by the defendant and the area of a like amount which the defendant has already sold to another purchaser.

The defendant contends that since he filled the part of the property with oyster shells and other material which he claimed were natural, he did not pollute or contaminate existing wetlands. The Court wholly rejects this view.

Therefore, the Court finds that the defendant filled on his property at Eel Creek the northern 6,000 square feet, that this placement of fill took more than two days, and that the fill material was placed in waters of the United States without the defendant having first applied for the necessary permits from the United States Army Corps of Engineers.

The Court finds that the defendant has continued the violation of the statutes in relation to filling material for more than 365 days in each instance.

## II.

Based upon observations made by this Court during its September 20, 1982 view of the property and upon the evidence adduced during the course of the hearings, the Court became curious as to whether a waterway in excess of 40 feet in width, which at one time apparently traversed Ocean Breeze Mobile Home Site, was an issue to be considered by the Court in this case. The government responded affirmatively.

The defendant claimed that he was unaware that the government intended to pursue any alleged filling of this former waterway and stated that he had not conducted sufficient discovery with regard to

this issue as would enable him to mount a defense. In consideration of the parties' relative positions, the Court deferred the claim advanced by the government referring to this waterway, and allowed the parties additional time for discovery and rescheduled the trial of this claim for a future time. The trial was resumed as to this issue after the completion of discovery by the defendant.

On or about January 26, 1963, Nat Steelman, a retired oyster inspector, and other watermen commenced the digging of this contested Fowling Gut Extended waterway at the expense of the United States. The waterway was dug as the result of the severe storm of Ash Wednesday of 1962 and was ostensibly for mosquito control purposes. An ancillary purpose for construction of the waterway was to facilitate and encourage boat traffic.[5]

Fowling Gut Extended was excavated in such a manner that it had a minimum depth of four feet at mean low water and a width of a minimum of forty feet. The property owners (Tull's predecessors in title) were compensated by the government.

Fowling Gut, as distinguished from Fowling Gut Extended (that portion which once ran through and under what is now this subdivision) prior to 1962 had two outlets to Chincoteague Channel by causeway under Main Street on State Route 2114. One of these causeways is at a point near the northeastern corner (Lot 30) of Ocean Breeze Subdivision and one near the northwestern corner of the subdivision (Lot 121). Fowling Gut naturally ran in an east/west direction along the northern boundary of the subdivision between these two causeways and thence ran in a short distance approximately 100 feet in a southerly direction along the eastern boundary of the subdivision (Lots 29 and 30) and then turned and proceeded eastwardly towards Mire Pond and the more populated part of the island and higher ground. It was at this turning point (Lot 29) that Fowling

**5.** See Exhibit 141–1 (letter to Roy C. Tolbert, Treasurer of Chincoteague Mosquito Control Commission, dated March 25, 1963).

Gut Extended was excavated in a straight line in 1963 in a southwesterly direction diagonally across what is now the subdivision of Ocean Breeze and that portion under Ocean Breeze is now located under what would be the letter "g" in the word "Fowling" on what is designated as the Coast and Geodetic Survey Map, Exhibit 10, and continued in a southwesterly direction not only through said subdivision but ultimately to Andrews Landing Gut which emptied into "The Canal" on one side and "Assateague Channel" on the other side. This excavation, in effect, created at least two additional islands in the southwestern portion of Chincoteague. Part of what is now Ocean Breeze Subdivision would have been on the mainland side of Chincoteague and part would have been on the island. Thus, Lots 29 through 33; 44 through 51; 57 through 69; Lots 120 and 121; and some drainfield lots would have been completely separated by tidal water at least forty feet wide and four feet deep at mean low water from the remaining lots of what is now Ocean Breeze Subdivision. Thus, the above-enumerated lots could not have been utilized unless a bridge was built on the waterway or the waterway blocked or obstructed in some manner.

Once completed, the waterway was of sufficient width and depth as to become navigable for large boats and for a brief period boats regularly traveled the entire length of this excavated waterway out to the sea. The Court finds that this waterway, Fowling Gut Extended, was navigable in fact and was utilized by boat traffic subsequent to 1963 and prior to the time when the defendant filled in this waterway without applying for or obtaining any permit from the Army Corps of Engineers. Not only was the waterway blocked by the defendant in this subdivision, but the waterway was also obstructed by the construction of Bunker Hill Campground Road by the defendant which is not a part of this particular litigation.

Two November 1975 aerial photographs of the partially developed Ocean Breeze Mobile Home Sites show this waterway still flowing across the property as an open navigable waterway. By late summer of 1976, the section of the waterway which traversed Ocean Breeze Mobile Home Sites was blocked by fill material. The filling of this waterway took place in late 1975, 1976, 1977 and thereafter.

The Court finds that the filling of Fowling Gut Extended, the portion of the waterway beneath what is now Ocean Breeze Subdivision, took more than fifty separate days of filling operation insofar as that portion contained in what is now Ocean Breeze Mobile Home Sites. The evidence indicated that no other individuals or concerns were engaged in filling activity on the Ocean Breeze Mobile Home Sites property during the years in question and the Court from the testimony of the defendant, the various persons engaged in the filling operation, the aerial photographs and the other evidence finds that the defendant was the sole person engaged in the filling of this waterway and that such filling was either done personally by him or at his direction or under his supervision insofar as Ocean Breeze Mobile Home Sites are concerned. The defendant neither applied for nor obtained any permit from the Corps of Engineers to fill and obstruct this navigable waterway which clearly falls within the ambit of "waters of the United States." Moreover, the defendant profited by his sale of these lots which would not have been accessible as well as those lots (some 40,000 square feet) that were actually a filled navigable waterway. The violation has continued for more than 365 days.

### III.

Jurisdiction over this action is conferred pursuant to 28 U.S.C. §§ 1331 and 1345.

Pursuant to 33 U.S.C. § 403, the creation of any obstruction not affirmatively authorized by Congress to the navigable capacity of any of the waters of the United States is prohibited. Nor shall it be lawful to fill or in any manner alter or modify the course, location, condition or capacity of any canal unless the work is authorized by the Secretary of the Army. 33 U.S.C. § 403 (1970).

**622**

This statute was enacted by Congress to give the federal government jurisdiction to prevent private parties from obstructing navigable waters of the United States. *United States v. Logan & Craig Charter Service, Inc.,* 676 F.2d 1216 (8th Cir.1982); *United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293 (5th Cir.1976).

■■■ There is no requirement that a body of water must sustain actual commerce in order to meet the test of navigability sufficient to support the Corps' jurisdiction over a proposed obstruction. Rather, the mere capability of commercial use of a body of water will suffice, even if such commerce is made possible with the addition of artificial aids. *Weiszmann v. District Engineer, United States Army Corps of Engineers,* 526 F.2d 1302, 1305 (5th Cir.1976) [*quoting United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940)] *See Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *United States v. DeFelice,* 641 F.2d 1169 (5th Cir.1981). Moreover, the lack of commercial traffic does not foreclose a determination of navigability under this section where personal and private use of boats demonstrates the capability of a waterway for simpler types of boat traffic. *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 416, 61 S.Ct. 291, 303, 85 L.Ed. 243 (1940); *United States v. Utah,* 283 U.S. 64, 82, 51 S.Ct. 438, 443, 75 L.Ed. 844 (1931); *United States v. Pot-Nets, Inc.,* 363 F.Supp. 812 (D.Del.1973).

■■■ A private waterway may fall within the ambit of navigable waters of the United States if it joins an existing interstate commerce waterway. *See Kaiser Aetna v. United States, supra.* Consequently, private canals which are subject to the ebb and flow of the tide and are navigable in fact because they are capable of flow in the stream of interstate commerce and are or may be so used constituting navigable waterways of the United States for

purposes of the Corps' jurisdiction under 33 U.S.C. § 403. *See Tatum v. Blackstock,* 319 F.2d 397 (5th Cir.1963).

The discharge of any pollutant by any person is expressly prohibited by law, except as provided in sections 1312, 1316, 1317, 1328, 1342 or 1344 of Title 33. 33 U.S.C. § 1311 (1978). Discharge of a pollutant is defined in § 1362 of Title 33 as any addition of any pollutant to navigable waters from any point source. 33 U.S.C. § 1362(12) (1978). A point source means any discernable, confined and discrete conveyance from which pollutants are discharged. 33 U.S.C. § 1362(14) (1978). As intended by the statute, the term pollutant means any dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, chemical wastes, biological materials, radioactive materials, wrecked or discarded equipment, rock, sand, cellar dirt, industrial, municipal waste or agricultural waste, which is discharged into water. 33 U.S.C. § 1362(6) (1978).

■■■ Bulldozers and dump trucks constitute point sources from which pollutants can be discharged within the meaning of Federal Water Pollution Control Act. *United States v. Weisman,* 489 F.Supp. 1331 (M.D.Fla.1980); *United States v. Holland,* 373 F.Supp. 665, 668 (M.D.Fla.1974).

■■■ Similarly, it has been held that fill material constitutes a pollutant within the statutory definition as expressed in 33 U.S.C. § 1362(6). *United States v. Weisman, supra.* Fill material composed of sand and debris would necessarily be considered an offending pollutant. *United States v. Bradshaw,* 541 F.Supp. 880 (D.Md.1981).[6]

Pursuant to 33 U.S.C. § 1344(a), the Secretary of the Army is authorized to issue permits for the discharge of fill material into navigable waters of the United States at specified disposal sites. 33 U.S.C. § 1344(a) (1978).

---

6. The United States Army Corps of Engineers regulations define fill material as "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody." 33 C.F.R. § 323.2(m) (1981).

The statute defines the term navigable waters as waters of the United States, including the territorial seas. 33 U.S.C. § 1362(7) (1978). In so doing, Congress intended to give to the term navigable waters, the broadest constitutional interpretation. *Deltona Corp. v. United States,* 657 F.2d 1184 (Ct.Cl.1981); *United States v. Byrd,* 609 F.2d 1204 (7th Cir.1979). Jurisdiction over waters of the United States is said to extend "well beyond the mean high water mark to marsh wetlands which are regularly or periodically inundated." *Conservation Council of North Carolina v. Costanzo,* 398 F.Supp. 653 (E.D.N.C.1975); *aff'd* 528 F.2d 250 (4th Cir.1975).

The Army Corps of Engineer regulations further define "waters of the United States" to include coastal and inland waters, rivers and streams that are navigable waters of the United States, including any adjacent wetlands. 33 C.F.R. § 323.2(a)(2) (1981). The term "navigable waters of the United States" is described by the regulations as "those waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark and/or are presently used, or have been used in the past or may be susceptible to use to transport interstate or foreign commerce. 33 C.F.R. § 323.2(b) (1981). As used in 33 C.F.R. § 323.2(a)(2) above, the term "wetlands" includes those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adopted for life in saturated soil conditions. 33 C.F.R. § 323.-2(c) (1981).

Wetlands generally include swamps, marshes, bogs, and similar areas. Consistent with this definition of wetlands, Congress and the courts have interpreted the term wetlands to include marshes, bays, and estuaries of waterbodies subject to tidal inundation. *Leslie Salt Co. v. Froehlke, supra; Avoyelles Sportsmen's League, Inc. v. Alexander,* 511 F.Supp. 278 (W.D. La.1981); *Conservation Council of North Carolina v. Constanzo, supra; United*

*States v. Darden,* C/A No. 81–652 (E.D.Va. February 2, 1982) (unpublished).

## IV.

The defendant has raised several affirmative defenses to the government's claims. Based upon the evidence adduced at trial, the Court concludes that the affirmative defenses advanced by the defendant do not relieve him from liability for violations of 33 U.S.C. § 403 and § 1344.

■ The defendant first argues that the statute and the regulations upon which the government relies as the bases for the exercise of its regulatory powers as they have been enforced in the Norfolk District against the defendant (presumably 33 U.S.C. §§ 1311, 1344 and 33 C.F.R. § 323, *et seq.*) are unconstitutional in that the enforcement thereof amounts to a taking of property without compensation in violation of the Fifth Amendment to the United States Constitution. At trial, the Court granted summary judgment in favor of the government as to this issue. Because the defendant has admitted that he never attempted to obtain an Army Corps of Engineers' permit prior to the filling of any of the properties at issue in this litigation his "taking" claim is not yet ripe for resolution. In *United States v. Byrd, supra,* the Seventh Circuit was faced with a similar argument from a defendant who had not yet applied for a permit from the Army Corps of Engineers. Holding that the defendant's argument was premature, the Court explained that, absent the rendering of some formal decision on the defendant's application by the Army Corps of Engineers, the defendant would be assuming a "taking" which may never materialize. *Id.* at 1211. *See also Deltona Corporation v. Alexander, supra.* Exhaustion of administrative remedies must necessarily precede any Court's review of a particular agency's action. Defendant Tull's failure to even attempt to exhaust his administrative remedies by applying for a permit from the United States Army Corps of Engineers renders his taking issue untimely.

The defendant next contends that 33 U.S.C. §§ 1311 and 1344 and the regulation set forth in 33 C.F.R. § 323.3(c) are unconstitutionally vague. As applied to the defendant, these statutes and the implementing regulation are sufficiently definite to have afforded the defendant, an individual of at least ordinary intelligence, fair notice of what conduct was prohibited or required by law. *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). *See United States v. Oxford Royal Mushroom Products*, 487 F.Supp. 852, 855 (E.D.Pa.1980) (terms navigable waters and waters of the United States held not void for vagueness). Furthermore, the Court cannot overlook the evidence indicating that the defendant is a knowledgeable and sophisticated developer, who possesses a rather substantial appreciation for the topography and vegetation on the island of Chincoteague.[7] The defendant's apparent familiarity with Chincoteague island vegetation belies the existence of any misapprehension on his part as to what the pertinent statutes and regulations required of him.

The defendant also seeks to invoke the doctrine of equitable estoppel against the government for statements not uttered and actions not taken by members of the Army Corps of Engineers during the period in which they were allegedly aware that filling was occurring on these properties. The defendant cites the July 21, 1976 visit to the Ocean Breeze Mobile Home Sites as one instance during which the Corps' silence "misled" him. It was during the July 21, 1976 visit that one of the Norfolk District engineers made specific reference only to a prohibition against further filling on the northwest sector of Ocean Breeze Mobile Home Sites. The defendant submits that the government should now be estopped from claiming improper filling activity on other portions of Ocean Breeze Mobile Home Sites since they were not specifically mentioned during the course of that site visit.

Likewise, the defendant asserts that, although government officials have long been aware that filling has occurred on the Mire Pond Camper Sites and the Eel Creek sites, they have taken no affirmative measures, apart from the commencement of this action, to discourage or prevent the continuation of these activities.

The Court finds this contention of the defendant is without foundation as the Court feels that the agents of the United States government did not mislead the defendant. Particularly with regard to the Eel Creek property, there is no evidence that the Army Corps of Engineers stood idly by while an endless parade of the defendant's dump trucks and bulldozers passed in review. To the contrary, a formal cease and desist order was issued by the Army Corps of Engineers in August of 1976, prohibiting the defendant from any further filling on the Eel Creek property until the defendant had applied for a permit. And as to Mire Pond II, the plaintiff obtained an injunction prohibiting the defendant's filling activities thereon.

Notwithstanding the evidence of the government's more than tepid interest in the defendant's filling activities, inaction or tacit acquiescence by government officials as to unlawful conduct alone cannot provide the basis for the imposition of an equitable estoppel against the United States of America. The general rule is that the United States is neither bound by nor estopped by the acts of its officers or agents in entering into an arrangement to do or cause to be done what the law does not sanction or permit. *See Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917). The United States Supreme Court has intimated, but not yet stated conclusively, that

---

7. For example, when asked by the Court to describe what he considered to be a marsh, the defendant responded that it was low lying land which could contain water. The defendant also opined that a portion of Lot 22(A) on Mire Pond II inspected by the Court and the parties during its September 20, 1982 view of the property might be marshland.

perhaps some affirmative conduct by the government's agents might warrant an exception to the general rule against the invoking of an equitable estoppel against the government. *See, e.g. Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981).

In *Deltona Corporation v. Alexander, supra,* the Eleventh Circuit held that the record failed to disclose evidence of any affirmative conduct on the part of government officials sufficient to estop the government from denying dredge and fill permits to a developer even though government officials had known of development plans from their inception and had unofficially endorsed the plans. *See United States v. Harvey,* 661 F.2d 767 (9th Cir. 1981) (affirmative conduct must be shown in order to invoke equitable estoppel against the government.)

■ The evidence here failed to disclose any statements or conduct of an affirmative nature conveyed by government officials to the defendant which could have caused the defendant to believe that he was authorized to fill those properties not specifically designated during the visits to the site or contained within the correspondence between the parties without first applying for a permit from the Army Corps of Engineers. Moreover, it has not been shown that any silence or inaction by the government was purposefully designed to mislead or confuse the defendant. The Court therefore finds no basis upon which to invoke the doctrine of equitable estoppel against the United States. *See United States v. Board of Trustees of Florida Keys Community College,* 531 F.Supp. 267 (S.D.Fla.1981) (government agent's delay in issuing a cease and desist order will not estop the government from enforcing violations under Rivers and Harbors Appropriation Act of 1899 and the Federal Clean Water Act).

Moreover, the defendant and the plaintiff were engaged in other adversary court actions during the relevant time period on different properties. The defendant was thus well aware of the necessity for applying for permits.

The defendant neither requested an application for a permit nor has he obtained a permit for any of the properties involved herein, or indeed any of his properties. Rather, the defendant has chosen to purposely disregard the regular manner of determination in order to assert some basis as justification of his illegal activities. Avoidance is always permissible but the defendant's activities appear to this Court to have been a deliberate attempt at evasion and misdirection by the defendant. Such actions would never support a claim for an estoppel even were the government not involved.

The defendant also argues that the issue as to whether the Army Corps of Engineers has regulatory jurisdiction over Ocean Breeze Mobile Home Sites, Mire Pond I and II and Eel Creek has already been litigated in *United States v. Tull,* C/A No. 75–319–N (E.D.Va. November 12, 1975) (unpublished) and *United States v. Tull,* C/A No. 73–304 (E.D.Va. March 21, 1974) (unpublished) and therefore should not be relitigated under the principles of collateral estoppel. A copy of the opinions rendered in those two actions was introduced into evidence by the defendant.

■ The doctrine of collateral estoppel inhibits a litigant "against whom an issue has been decided in a prior final judgment from relitigating its rejected position in a subsequent proceeding." *Hughes v. Heyl & Patterson, Inc.,* 647 F.2d 452 (4th Cir. 1981) [citing *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)]. For this Court to apply the principles of collateral estoppel, the question expressly and definitely raised in this suit must be the same as that actually litigated and adjudged adversely to the government in either of the cited decisions involving the defendant Edward Lunn Tull. *Hughes v. Heyl & Patterson, supra. See Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

Having thoroughly considered all the issues presented in the prior actions, the Court is of the opinion that the resolution of the issues in those cases does not bar the present adjudication of any issue in this case. Indeed, the defendant concedes that different properties are involved. Also, the alleged filling conducted thereon appears to have been of a different character than that which is complained of here. As there would appear to be an absence of identity of issues among the three cases, collateral estoppel will not be applied.

## V.

Pursuant to 33 U.S.C. § 406, a district court is authorized to enforce by injunction, the removal of an obstruction placed in navigable waters in violation of 33 U.S.C. § 403. 33 U.S.C. § 406 (1970). Where the navigable capacity of a particular navigable body of water has been unlawfully altered or modified, a district court maintains the requisite injunctive power to order appropriate restoration. *United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960).

The government may also obtain injunctive relief against an offending party for violations of 33 U.S.C. § 1311, pursuant to 33 U.S.C. § 1319(a)(1). A district court may also assess a civil penalty against any person who fails to comply with 33 U.S.C. § 1311 or § 1344. 33 U.S.C. § 1319(d).

As this Court sits in equity, as well as in law, it cannot look favorably upon the defendant's unwillingness to seek the permit required by law for any of his filling activities or upon his failure to discuss any possible alternatives to his proposed filling of wetlands with government officials. Nor can this Court look kindly upon the defendant's apparent refusal to comply with a cease and desist order issued by a United States government agency. Unlike the plaintiff in *1902 Atlantic Limited v. Hudson*, 574 F.Supp. 1381 (E.D.Va.1983) decided this day, wherein the plaintiff not only applied for a permit, but submitted a plan to mitigate damage as to affected wetlands, defendant Tull has shown scant respect for the preservation of waters of the United States.

It would be inequitable for this Court to allow the defendant to benefit from the commission of an unlawful act. For the sale of each lot which he owned, the defendant realized approximately $5,000 net profit per lot. Moreover, more than one day's illegal activities in filling took place with regard to each lot and more than 365 days' violation has taken place in allowing the illegal fill to remain. Thus, for the filling of the wetlands lots 120, 121, 39(B), 59(B), 62(B), 71(B) and 72(B) on Ocean Breeze Mobile Home Sites, the defendant is hereby assessed a total penalty or civil fine in the sum of $35,000.00.

Although the defendant at no time material to this action owned lots 22, 23, 24, 25, 26 and 29 in Mire Pond I, sufficient to have derived a profit from their sale, he nevertheless filled the wetlands therein for his own economic benefit. Similarly, although the defendant has not yet sold lot 8(A) on Mire Pond II, his filling thereon was designed to facilitate their sale, and the Court will assess an appropriate penalty for the unlawful filling of the lots on Mire Pond II. Since the evidence showed that at least one day's filling occurred on each of these lots, the defendant shall be assessed a total penalty or civil fine of $35,000.00 for the filling of Lots 22, 23, 24, 25, 26 and 29 and 8(A).

A $5,000 penalty or civil fine shall likewise be imposed upon the defendant for the filling of the wetlands on the 6,000 square foot parcel of land adjoining Eel Creek.

Further, any fill placed on lots 7C, 8C, 9C, 10C and 11C in Ocean Breeze Mobile Home Sites Section C shall be removed, and those lots restored to wetlands within six months from the date hereof *unless* the defendant is granted an after-the-fact permit by the Army Corps of Engineers. The defendant shall post a $10,000 bond with surety to insure completion of the restoration of these lots.

For the unlawful filling of a navigable waterway of the United States, namely the

extension of Fowling Gut, the Court OR-DERS the defendant to pay a fine in the sum of $250,000.00. The defendant, Edward Lunn Tull, may suspend the payment of this fine on the specific condition that he restore the extension of Fowling Gut to its former navigable condition as it existed between 1963 and November 1, 1975, through what is now the Ocean Breeze Subdivision, as provided in this Court's opinion. If the defendant so elects to restore the extension of Fowling Gut, he must file a written election with the Clerk of this Court within ten (10) days from the date hereof and shall post a penalty bond secured by a corporate surety approved by the Clerk of the Court in the amount of $300,000.00, payable to the United States conditioned upon the completion of the restoration within twelve (12) months from the date of this order. Further, the defendant shall restore the waterway under the supervision and to the satisfaction of the United States Army Corps of Engineers in accordance with the instructions contained in the Court's opinion. Equity dictates that the defendant either pay a stiff civil penalty or make appropriate restoration for permanently depriving the United States government and its people of a navigable waterway capable of supporting both commercial navigation and pleasure boating.

The defendant is further ORDERED to restore two lots (other than lots 8(A), 9(A), 10(A), 11(A), 12(A) or 22(A)) in Mire Pond Camper Sites II to wetlands as part mitigation for the lots unlawfully filled by the defendant in Mire Pond I. Third parties have interests in lots 22, 23, 24, 25, 26 and 29 of Mire Pond, and this Court seeks not to punish them for the acts of the defendant. Additionally, the defendant and those who succeed to his rights are permanently enjoined from further filling of any kind in lots 8(A), 9(A), 10(A), 11(A), and 12(A), 13(A) and 22(A) (the latter six lots also appearing to be wetlands) on Mire Pond II until such time as appropriate restoration of wetlands as required above has been made, (as approved by and under the supervision of the United States Army Corps of Engineers) *and* until such time as the nec-

essary permits are issued for filling on any of these lots if the Corps of Engineers desires to grant such permits in accordance with its rules and statutes. Restoration thereof shall be completed within six (6) months from the date of this order or within such future date as set by this Court. Prior to any such restoration, the defendant shall post a bond in the sum of $10,000 with surety.

It is further ORDERED that the defendant restore to wetlands all portions of the 6,000 square foot parcel of land abutting Eel Creek, (previously discussed in Part I of this opinion), which were owned by the defendant at the time of the filing of any lis pendens or the filing of the suit, (whichever was earlier). Restoration shall be completed within six (6) months of the date of this order or within such future dates as set by this Court and shall be under the supervision of the Army Corps of Engineers of the United States. Once appropriate restoration has been made, the defendant shall be permanently enjoined from conducting any filling activities thereon until such time as he shall obtain a permit from the United States Army Corps of Engineers. Prior to the commencement of any such restoration on the Eel Creek property, the defendant shall post a bond in the sum of $5,000 with surety.

It is further ORDERED that the costs of this litigation be borne by the defendant. Included within the costs of this litigation shall be an $800.00 expert witness fee to be paid to Professor Donna Ware, which fee the Court specifically finds is reasonable. Should the defendant fail to pay this fee within thirty (30) days from the date of this order, said fee shall be paid by the plaintiff, the United States of America, which the plaintiff may thereafter recover from the defendant.

The Court will entertain a request by the government for a reasonable award of attorney's fees. Such a request should be submitted within ten (10) days in accordance with the local rules. IT IS SO ORDERED.